UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| BARRY DAVIS, Individually, and as Administrator of the Estate of LINDA MARIE DAVIS, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>ELI LILLY AND COMPANY,<br><br>Defendant. | CIVIL ACTION No. 04-10349 (MEL) |
|---|---|

**DEFENDANT ELI LILLY AND COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Defendant Eli Lilly and Company ("Lilly") submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment. Plaintiff alleges that Mrs. Linda M. Davis was exposed *in utero* to diethylstilbestrol and that this exposure caused her injuries. Lilly is entitled to summary judgment on all counts, because Plaintiff has not produced any evidence that Mrs. Davis was exposed to diethylstilbestrol. Additionally, each of Plaintiff's claims - negligence, strict liability, breach of warranty, and negligent misrepresentation - rests on the alleged inadequacy of Lilly's written product literature and warnings. Each claim, then, requires Plaintiff to prove that (1) those written materials were read and relied upon by the prescribing doctor and that (2) the doctor would not have prescribed the drug had different written materials been supplied. But Plaintiff has no evidence that the prescribing doctor saw, read, or relied on Lilly's literature. Without more, Plaintiff has failed to meet the reliance component of his causation burden and Lilly is entitled to summary judgment on all counts.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

1. The Complaint was filed by plaintiff Linda and Barry Davis in February, 2004. Complaint (attached as Exhibit 1 to the Affidavit of Ashley A. Weaver) ("Weaver Aff."). An Amended Complaint was filed by Barry Davis, individually and as administrator of the estate of Linda Davis, in September, 2004 (Weaver Aff., Ex. 2).

2. While pregnant with Mrs. Davis, Mrs. Davis' mother, Mrs. Dorothy White Manning, was allegedly prescribed diethylstilbestrol, or "DES," by her physician, Dr. Paul Montag, in 1960. Amended Complaint at ¶ 8 (Weaver Aff., Ex. 2); Plaintiff's Answers to Eli Lilly and Company's First Set of Interrogatories ("Resp. to Interrog.") Nos. 7-8 (Weaver Aff., Ex. 3). Dr. Montag is now deceased. Social Security Death Index (Weaver Aff., Ex. 4).

3. Mrs. Manning has no specific memory of the appearance of the pill she allegedly ingested while pregnant with Mrs. White. Resp. to Interrog. No. 10 (Weaver Aff., Ex. 3). Mrs. Manning believes she ingested a white tablet. *Id.*

4. Mrs. Manning testified at deposition that she did not remember what Dr. Montag called the pill but only that he was prescribing a pill "that would hold the baby" (i.e. prevent miscarriage). Deposition Transcript of Dorothy White Manning ("Manning Tr.") at 37-38 (Weaver Aff., Ex. 5); *see also* Amended Complaint at ¶ 8 (Weaver Aff., Ex. 2); Resp. to Interrog. No. 8 (Weaver Aff., Ex. 3).

5. At deposition, Mrs. Manning testified that she now believes she ingested Stilbestrol, based solely on a telephone conversation with an unidentified person at Dr. Montag's office in the 1970's. Manning Tr. at 37-39 (Weaver Aff., Ex. 5). Mrs. Manning has never

---

[1] Lilly accepts these facts as undisputed for purposes of this summary judgment motion only and reserves the right to contest any of these facts at trial.

looked at her medical records to determine if the records identify the pill she ingested. *Id.* at 39 (Weaver Aff., Ex. 5).

6. Diethylstilbestrol, a synthetic form of estrogen, was only one of several prescription drugs in 1960 used for the prevention of miscarriages. The 1960 edition of the Physicians' Desk Reference ("PDR") has 42 entries in the Therapeutic Indications Index under "Abortion (Habitual and Threatened)" (Weaver Aff., Ex. 6); *see also* Affidavit of Benjamin P. Sachs, M.D. ("Sachs Aff.") at ¶ 3. Only one of the listings is for diethylstilbestrol. In addition, the 1960 edition of the PDR lists other natural and synthetic forms of estrogen, progesterone, and female hormones not listed in the Therapeutic Indications Index listing above. *Id.* (Weaver Aff., Ex. 6); Sachs Aff. at ¶ 3.

7. "DES" was a generic drug, never patented, that was never proprietary to any company. *Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187, 188 (Ohio 1998) ("Because DES was not patented, some two hundred to three hundred drug companies produced DES in the years it was widely prescribed for use during pregnancy.").

8. In the field of medical research concerning DES since 1971, the term "DES" is commonly used as a term denoting not merely the particular drug product diethylstilbestrol but also any of the several other non-steroidal synthetic estrogens given, during the relevant periods, to pregnant women. Sachs Aff. at ¶ 8.

9. Research by Dr. Arthur Herbst and others on the possible effects of "DES" upon women whose mothers took the drug defined the terms "DES" and "diethylstilbestrol" in a manner that included several distinct drug products that are synthetic non-steroidal estrogens including, but not limited to, the particular drug diethylstilbestrol. Sachs Aff. at ¶ 5. In this

research project, "diethylstilbestrol exposure" was defined as "exposure to any exogenous non-steroidal estrogen, including diethylstilbestrol, dienestrol, and hexestrol." *Id.*

10. The National Cooperative Diethylstilbestrol Adenosis Project ("DESAD") was created to study other possible effects of "DES" upon women whose mothers had taken the drug. Sachs Aff. at ¶ 6. For that project, the term "DES" was defined as synthetic non-steroidal estrogens, a designation that includes but is not limited to the particular drug diethylstilbestrol. *Id.*

11. In 1976, the then U.S. Department of Health, Education, and Welfare ("DHEW") issued a publication using the terms "diethylstilbestrol" and "DES" to mean diethylstilbestrol and other non-steroidal synthetic estrogens categorized as "DES-type" drugs. "Information for Physicians: DES Exposure *In Utero*" ("DHEW publication") (Weaver Aff., Ex. 7); Sachs Aff. at ¶ 7. The DHEW publication goes on to list the "DES-type" drugs that may have been prescribed to pregnant women. Under the category "non-steroidal estrogens," 68 drugs are listed. In addition, there were drug products that included a non-steroidal estrogen and other hormones in a single drug product. Eight such combination drugs are listed as "DES-type" drugs. *Id.* Hexestrol, Benzestrol, and Dienestrol are examples of "DES-type" drugs. *See* DHEW publication (Weaver Aff., Ex. 7); *see also* Sachs Aff.

12. Lilly made and sold diethylstilbestrol in 1960.

13. In 1960, at least 106 companies manufactured diethylstilbestrol. *See American Druggist Blue Book* ("Blue Book"), 1960-61 (excerpts at Ex. 8 to Weaver Aff.); *Drug Topics Red Book* ("Red Book"), 1960 (excerpts at Ex. 9 to Weaver Aff.). Stilbetin is one example of another diethylstilbestrol made by Squibb in 1960. *Id.*

14. Plaintiff has produced no medical records, prescription records, or other evidence demonstrating that Dr. Montag prescribed diethylstilbestrol to Mrs. Manning as opposed to any other "DES-type" drug or other miscarriage preventative.

15. Mr. Davis alleges that Lilly's failure to warn proximately and in fact caused the injuries for which he is now claiming damages. Amended Complaint at ¶¶ 11 (Count I - Negligence), 15-16 (Count II - Strict Liability), 18-21 (Count III - Breach of Warranty), 24-28 (Count IV - Negligent Misrepresentation), and 31 (Count V - Punitive Damages) (Weaver Aff., Ex. 2).

16. Federal Regulations now and in the years of Mrs. Manning's pregnancy with Mrs. Davis required *all* manufacturers of prescription medications to provide instructions and warnings *for physicians* on prescription medications that could only be obtained through the order of a licensed medical practitioner. Federal Food, Drug and Cosmetic Act §§ 502, 503, 21 U.S.C. §§ 352(f), 353 (1938) (Weaver Aff., Ex. 10); Food and Drugs, 21 C.F.R. § 1.106 (1956 & Supp. 1960) (Weaver Aff., Ex. 11).

17. Consumer oriented package inserts were not required until at least 1976. Estrogen Preparations, 41 Fed. Reg. 47,573, 47,576 (Oct. 29, 1976) (Weaver Aff., Ex. 12).

18. Plaintiff has provided no evidence demonstrating that Dr. Montag ever read or consulted Lilly's product warnings and literature in determining whether or not to prescribe a medication to Mrs. Davis' mother.

## III. ARGUMENT

### A. SUMMARY JUDGMENT IS MANDATED FOR A DEFENDANT WHERE THERE IS NO EVIDENCE ON AN ELEMENT ESSENTIAL TO PLAINTIFF'S CLAIMS.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the moving party asserts "an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the latter must establish the existence of an issue that is both "genuine" and "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party moving for summary judgment in a case where the opposing party will have the burden of proof at trial is entitled to summary judgment if he negates an essential element of the opponent's case or demonstrates that proof of that element is unlikely to be forthcoming at trial. *Kourouvacilis v. GMC*, 410 Mass. 706, 716 (1991); *Flesner v. Tech. Communications Corp.*, 410 Mass. 805, 809 (1991). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249-50.

Plaintiff has the burden of proving a causal connection between an allegedly tortious act of a defendant and her claim of injury. Where the non-moving party bears the burden of proof, it may not defeat summary judgment by relying upon mere allegations or evidence that is "merely colorable" or "not significantly probative." *Id.* Rather, the party must produce sufficient admissible evidence to support a jury verdict. *Id.* at 248, *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49-50 (1st Cir. 1990).

**B. PLAINTIFF CANNOT PROVE THROUGH ADMISSIBLE EVIDENCE THAT SHE WAS EXPOSED TO THE PRODUCT THAT LILLY MADE**

Plaintiff alleges that Mrs. Davis was exposed *in utero* to diethylstilbestrol. Plaintiff cannot prevail on any of his claims because he cannot prove, through the use of admissible evidence, that Mrs. Davis was ever exposed to diethylstilbestrol. *Cf. Celotex Corp.*, 477 U.S. at 322. Because there is no admissible evidence that Ms. Davis was ever so exposed, Plaintiff's claims fail as a matter of law, and summary judgment should be granted.

Mrs. Manning testified at deposition that she did not know the name of the drug she was allegedly prescribed while pregnant with Mrs. Davis. Manning Tr. at 37-38 (Weaver Aff., Ex. 5). She only knew that she was prescribed a pill to prevent miscarriage. *Id.* (Weaver Aff., Ex. 5). She has no specific memory of the pill except that she believes it was a white tablet. Resp. to Interrog. No. 10 (Weaver Aff., Ex. 3). She has never looked at her medical records to determine the identity of the pill she ingested. Manning Tr. at 39 (Weaver Aff., Ex. 5). In short, Mrs. Manning has no knowledge or memory about the identity of the drug she was prescribed in 1960.

Diethylstilbestrol was not the only drug prescribed in 1960 for the prevention of miscarriages. The 1960 Physicians' Desk Reference lists 42 in the Therapeutic Indications Index under "Abortion (Habitual and Threatened)," only one of which was diethylstilbestrol. *See* PDR (Weaver Aff., Ex. 6); Sachs Aff. at ¶ 3. Some of these drugs prescribed for the prevention of miscarriage are referred to as "DES" or "DES-type" drugs - these are terms that encompass many distinct drug products including, but certainly not limited to, diethylstilbestrol. *See* DHEW publication (Weaver Aff., Ex. 7); Sachs Aff. at ¶¶ 3, 5-8. Thus, Mrs. Manning's deposition testimony that she ingested a drug to prevent miscarriage while pregnant with Mrs. Davis is insufficient to establish that the drug was diethylstilbestrol.

**1. ALLEGED STATEMENTS TO MRS. MANNING CONCERNING DES EXPOSURE MUST BE EXCLUDED AS HEARSAY.**

Plaintiff will attempt to demonstrate exposure to diethylstilbestrol through a statement allegedly made to Mrs. Manning by an employee of her prescribing physician, Dr. Montag. This statement is inadmissible as hearsay. At her deposition, Mrs. Manning testified that after seeing a television program or commercial in the 1970's about "DES," she called Dr. Montag's office to determine whether or not "DES" was the pill she ingested while pregnant with Mrs. Davis. Manning Tr. at 37-39 (Weaver Aff., Ex. 5). Mrs. Manning then testified that she spoke to somebody on the telephone who told her she had taken "Stilbestrol." *Id.* (Weaver Aff., Ex. 5). However, Plaintiff has not identified or produced oral or written evidence from this witness. Furthermore, Mrs. Manning herself testified that she never viewed her medical records to determine if she had in fact been prescribed "Stilbestrol." Manning Tr. at 39 (Weaver Aff., Ex. 5). The alleged statement by the unidentified employee of Dr. Montag is an out of court statement offered for its truth on a critical element of Plaintiff's claims. Accordingly, it is hearsay and cannot be used to prove Plaintiff's claims. *See Commonwealth v. Keizer*, 377 Mass. 264, 269 n.4 (Mass. 1979).

Although Plaintiff may argue that the statement to her is admissible under the hearsay exception for statements made for the purpose of medical diagnosis or treatment, *see* Fed. R. Evid. 803(4), this exception does not apply here. The exception exists because an out of court declarant speaking about <u>her own symptoms</u> has a presumed motive to give accurate information and to tell the truth when <u>her medical treatment</u> will be based on the information she gives. *See White v. Illinois*, 502 U.S. 346, 356 (1992). Rule 803(4) is rooted in the principle that "a statement made in the course of procuring medical services, where the declarant knows that a false statement may cause misdiagnosis or mistreatment, carries special guarantees of

credibility." *Id*. (emphasis added); *see, e.g., United States v. Funds Held in the Name of Wetterer*, 991 F. Supp. 112, 119 (E.D. N.Y. 1998), *rev'd on other grounds*, 210 F.3d 96 (2nd Cir. 2000); *see also* 2 McCormick on Evidence § 277, at 246-47 (The Rule 803(4) exception to the hearsay rule for statements to a treating physician rests on a theory of reliability flowing from the patient's understanding "that the effectiveness of the treatment received will depend upon the accuracy of the information provided to the physician.").

Here, the statement by the unnamed out of court declarant has none of the indicia of reliability that might accompany a recitation of personal symptoms by a patient for medical diagnosis. The statement does not deal with symptoms and was not given for purposes of diagnosis or treatment. Mrs. Manning had taken the medication over 10 years earlier and no diagnosis or treatment was at issue. In addition, Mrs. Manning was seeking this information with her daughter's health in mind. The medical diagnosis or treatment exception would only be applicable if the statement was made by Mrs. Davis for the purposes of diagnosis or treatment of Mrs. Davis. The out of court statement cannot be relied upon by Plaintiff to avoid a grant of summary judgment to Lilly.

**2. MRS. DAVIS' STATEMENTS TO HER DOCTORS, WHETHER APPEARING IN HER MEDICAL RECORDS OR ELSEWHERE, MUST BE EXCLUDED AS HEARSAY.**

Any medical records indicating that Mrs. Davis was exposed to "DES" are also inadmissible hearsay because they draw that conclusion from inadmissible hearsay statements about "DES" exposure passed on from an unidentified witness to Mrs. Manning to Mrs. Davis to Mrs. Davis' medical treaters. Federal Rule of Evidence 805 requires each level of hearsay contained in such records to satisfy a hearsay exception before the statement is admissible. *See Woolfolk v. Eli Lily & Co.*, No. C03-3577RSM (W.D. Wa. Mar. 15, 2005) (stating that references to DES exposure in medical records without adequate foundation to establish the basis

for diagnosis is hearsay, inadmissible on summary judgment) (Weaver Aff., Ex. 13); ***Wilson v. Zapata Off-Shore Co.***, 939 F.2d 260, 271 (5th Cir. 1991). Plaintiff's treaters cannot have any independent knowledge of Mrs. Davis' alleged exposure to "DES." There are no medical or pharmacy records recording a prescription for diethylstilbestrol to Mrs. Manning in 1960, so Mrs. Davis' treaters could not have reviewed such records to satisfy themselves about a 1960 prescription in order to further treat Mrs. Davis. In short, Mrs. Davis' treaters' only possible source for noting that Mrs. Davis was exposed to "DES" in 1960 was Mrs. Davis herself. Because Mrs. Davis' belief that she was exposed to DES rested solely on inadmissible hearsay from Mrs. Manning, any references to "DES" in Mrs. Davis' medical records are double hearsay not admissible under Rule of Evidence 805. *See* Fed. R. Evid. 805; ***Weston-Smith v. Cooley Dickinson Hosp., Inc.***, 153 F.Supp.2d 62, 69 (D. Mass. 2001); ***Pakizegi v. First Nat'l Bank of Boston***, 831 F.Supp. 901, 909 (D. Mass. 1993); 5 WEINSTEIN'S FEDERAL EVIDENCE § 805.04.

Finally, even if the medical record references to "DES" were to be allowed into evidence, those references are not sufficient to prove use of Lilly's diethylstilbestrol as opposed to any of the other "DES-type" drugs that might have been prescribed. "DES" is a term that is used to encompass many synthetic non-steroidal estrogens. In the field of medical research concerning DES since 1971, the term "DES" is commonly used as a term denoting any of the several non-steroidal synthetic estrogens given, during the relevant periods, to pregnant women. Sachs Aff. at ¶ 8. Dr. Herbst, in his research on "DES," defined the terms "DES" and "diethylstilbestrol" in a manner that included several distinct drug products that are synthetic non-steroidal estrogens including, but not limited to, the particular drug diethylstilbestrol. Sachs Aff. at ¶ 5. And, for the DESAD project, the term "DES" was defined as synthetic non-steroidal estrogens, a designation that includes but is not limited to the particular drug diethylstilbestrol. *Id.* The

DHEW publication uses the term "DES" to mean diethylstilbestrol and other non-steroidal synthetic estrogens categorized as "DES-type" drugs. DHEW publication (Weaver Aff., Ex. 7); Sachs Aff. at ¶ 7. The DHEW publication lists more than 75 medications as "DES-type" drugs.

#### 3. MRS. DAVIS' DIAGNOSIS WITH CLEAR CELL CARCINOMA DOES NOT PROVE EXPOSURE TO DIETHYLSTILBESTROL.

Plaintiff may argue that the type of cancer with which Mrs. Davis was diagnosed—clear cell adenocarcinoma—is proof of her exposure to "DES." Even if Lilly were to accept a causal relationship between "DES" and this cancer -- which it does not -- "DES" is simply not specific to the "DES-type" drug that Lilly made - diethylstilbestrol. First, Plaintiff's expert, Dr. Susan Zweizig, testified at deposition that clear-cell adenocarcinoma of the vagina can occur in women with no connection to maternal use of DES. Deposition Transcript of Susan Zweizig, M.D. at 91-92. In fact, Dr. Zweizig testified that "there are some cases [of clear cell adenocarcinoma] where the cause is unknown." ***Id.*** at 93. Second, as explained above, Section III.B.2, even if clear cell adenocarcinoma were indicative of exposure to "DES," exposure to "DES" does not establish exposure to diethylstilbestrol.

### C. PLAINTIFF CANNOT PROVE THAT DR. MONTAG RELIED UPON LILLY'S WARNINGS

Because Plaintiff cannot prove which miscarriage preventative Mrs. Davis was exposed to, whether a "DES-type" drug, diethylstilbestrol, or some other drug to prevent habitual abortion, Lilly's warnings are not even relevant to this case. Even if Plaintiff could prove that Mrs. Davis was exposed to diethylstilbestrol, Plaintiff's claims still fail, because Lilly's literature was not the only source of information about diethylstilbestrol.

**1. BECAUSE THE SUBJECT MATTER OF THIS CASE IS A PRESCRIPTION DRUG, THE LEARNED INTERMEDIARY RULE APPLIES.**

In Massachusetts, a drug manufacturer's duty to warn runs to the prescribing physician and not to the ultimate consumer of the product. *See Garside v. Osco Drug, Inc, 976* F. 2d. 77, 80 (1st Cir. 1992). The prescribing physician is the logical target of a warning concerning a prescription medication, because only the physician has the scientific acumen required to comprehend the risks and benefits associated with prescription drugs. *Id.* A physician serves as a learned intermediary between a drug manufacturer and an ultimate patient or consumer. *See id.* Therefore any duty to warn runs to that physician, and not to the patient. *See Knowlton v. Deseret Medical, Inc.,* 930 F.2d 116, 120 n.2 (1st Cir. 1991). This case, arising from events allegedly occurring in 1960, predates any use of consumer oriented package inserts, which were not required until at least 1976.[2] Estrogen Preparations, 41 Fed. Reg. 47,573, 47,576 (Oct. 29, 1976) (Weaver Aff., Ex. 12).

Plaintiff must be able to demonstrate that Lilly breached a duty by failing to adequately warn Dr. Montag of the risks associated with diethylstilbestrol and, because of that failure, Dr. Montag prescribed diethylstilbestrol. Without proving that Dr. Montag ever read, viewed, or relied on Lilly's product warnings, Plaintiff cannot prove that any alleged failure to warn by Lilly caused the injuries that serve as the basis for this action.[3]

---

[2] In 1960, drugs dispensed by prescription had only limited labeling requirements for the product as sold to consumers - essentially, the pharmacist was required to attach a label with the patient's name, directions for use and cautionary statements, if any, contained in the prescription and dating and dispensing information. *See* Federal Food, Drug, and Cosmetic Act § 503(b)(2), 21 U.S.C. § 353(b)(2) (1938) (Weaver Aff., Ex. 10).

[3] Lilly does not concede that its product literature concerning diethylstilbestrol was in any way inadequate. However, for purposes of this summary judgment motion only, Lilly focuses on Plaintiff's inability to prove that any alleged inadequacy caused Mrs. Davis' injuries.

**2. PLAINTIFF'S CLAIM FOR NEGLIGENT FAILURE TO WARN MUST FAIL BECAUSE PLAINTIFF CANNOT DEMONSTRATE THAT LILLY'S WARNINGS WERE RELIED UPON BY DR. MONTAG.**

A cause of action for negligent failure to warn requires a plaintiff to prove that a prescription drug manufacturer: (1) owed a duty to warn users of potential dangers of a medication; (2) breached that duty by not adequately warning of risks associated with that drug; (3) where such breach in fact caused harm because of a failure to warn; (4) where such breach proximately caused harm because of the failure to warn; and (5) that the failure to warn caused damages. *See MacDonald v. Ortho Pharm. Corp.*, 475 N.E.2d 65, 70-72 (Mass. 1985). In the context of prescription drugs, a drug manufacturer's warning is directed at a prescribing physician, not the patient. *See Garside*, 976 F.2d at 80. Therefore, Plaintiff must prove that Lilly failed to warn Dr. Montag of the risks associated with the product. *See id.*

An inadequate warning may be the specific or proximate cause of harm only if the failure to warn led to a prescription that would not otherwise have occurred. Plaintiff cannot prove that Dr. Montag even read, much less relied upon, Lilly's warnings at the time he allegedly prescribed a miscarriage preventative to Mrs. Manning, because Dr. Montag is now deceased. Without such proof, Plaintiff cannot then claim that any deficiency in Lilly's warnings or literature was the specific cause of Mrs. Davis' harm, proximately caused her harm, or that any additional warnings by Lilly would have prevented her injuries. *See Motus v. Pfizer Inc.*, 358 F.3d 659, 661 (9th Cir. 2004).

**a. The "Heeding Presumption" Cannot Supply the Threshold Evidence that Dr. Montag Read and Relied On Lilly's Warnings.**

Plaintiffs in products liability cases can, once clear predicates are proved, gain the benefit of a rebuttable "heeding presumption" that an adequate warning would have been considered by the prescribing doctor, would have altered the doctor's decision to prescribe, and, therefore,

would have prevented the injury. The predicate condition for this presumption is that the particular defendant failed to warn the specified physician who wrote the prescription. This predicate proof establishes the nexus between the defendant's act - the warning - and the prescription that allegedly caused harm. This link is required because, without it, a defendant with no connection to the events at issue might be held liable based on a warning that was never consulted and that caused no harm.

Once a plaintiff establishes that a particular drug manufacturer failed to adequately warn the prescribing physician, only then does the heeding presumption shift the burden to the defendant to disprove that any additional warning would have prevented plaintiff's injury. The heeding presumption fills in the gaps in the causal chain after a plaintiff proves that the defendant gave an inadequate warning to the doctor but may be unable to prove that an adequate warning to that doctor would have prevented a plaintiff's injury. *See Garside*, 976 F.2d at 81 (1st Cir. 1992) ("However, where an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was a proximate cause of the plaintiff's ingestion of the drug."); *Knowlton*, 930 F.2d at 123 (1st Cir. 1991) ("This [heeding] presumption, absent the production of rebutting evidence by the defendant, is sufficient to satisfy the first branch of plaintiff's proximate cause burden.").

This presumption may be rebutted by evidence that the particular prescribing physician would not have changed his prescription decision even if the "adequate" warning had been given. *See Garside*, 976 F.2d at 81. The specificity of this rebuttal evidence reinforces the point made here - to merit the benefits of the "heeding presumption" a plaintiff must show at least that the specific prescribing doctor saw and relied upon an "inadequate warning." Rebuttal proof that

this doctor would not have been influenced by a different warning makes no sense if that doctor never saw or considered the defendant's warning in the first place.

In each of the cases cited above, there was no dispute as to whose warnings were involved. *See Garside*, 976 F.2d at 78-79 (focusing only on the adequacy of the manufacturer's warnings); *Knowlton,* 930 F.2d at 117 (same). Because those defendants' warnings were implicated in the decision to prescribe or use, it was reasonable to invoke the "heeding presumption" that any alteration in *that specific company's* product literature would have reached that same prescribing doctor, been heeded, and prevented injury. However, this presumption does not carry the same logical power with generic, unpatented products because there are many sources of warnings other than the single defendant here.

**b. Plaintiff Cannot Prove that Lilly Failed to Warn Dr. Montag.**

Plaintiff has no evidence of what literature, if any, Dr. Montag might have relied upon in deciding to prescribe a miscarriage preventative to Mrs. Manning. First, it is not shown that Dr. Montag prescribed diethylstilbestrol at all. Further, each of the 106 other companies that manufactured diethylstilbestrol in 1960, *see Blue Book* (Weaver Aff., Ex. 8); *Red Book* (Weaver Aff., Ex. 9), had product literature with warnings, as mandated by the federal government.[4] Dr. Montag could have relied on the literature for Stilbetin, Hexoestrol, Benzestrol, Dienestrol, or any of the other diethylstilbestrol or "DES-type" products. Further, the use of "DES-type" drugs was, by the time of the prescription here, long standing and well established. Over the quarter century from the first approval of the drug for use in pregnancy, many articles on the subject appeared in peer review journals, texts discussed its use, and standards of practice were

[4] By statute and by Federal Food and Drug Administration regulations, *each* company that manufactured prescription drugs was required to provide its own product literature, including warnings. Prescription medications that lacked such adequate warnings would be deemed misbranded drugs, and would subject manufacturers to

established. Dr. Montag could have relied upon articles in medical journals, text books, information from other doctors, or information gathered at medical lectures, seminars, or training programs.

Without proving that Lilly's warnings - as opposed to those of one of the many other sources where information about diethylstilbestrol was available - were used by Dr. Montag, Plaintiff cannot show that (1) Lilly failed to adequately warn Dr. Montag, (2) that but for Lilly's warning, Dr. Montag would not have prescribed diethylstilbestrol, or (3) that any warning by Lilly - adequate or not - would have changed Dr. Montag's prescription practices. Lilly's warnings are not the "but for" cause - the specific, proximate cause - for the injury here without proof that Lilly's warnings even factored into Dr. Montag's prescription and treatment decisions. It is rhetoric - not proof - to presume that Dr. Montag must have read Lilly's warnings. This causal element is one that Plaintiff must prove, and this is a burden Plaintiff has failed to meet.[5]

**3. PLAINTIFF'S NEGLIGENT MISREPRESENTATION CLAIM MUST FAIL BECAUSE PLAINTIFF CANNOT MEET HIS BURDEN OF PROVING THAT DR. MONTAG DETRIMENTALLY RELIED ON STATEMENTS MADE SPECIFICALLY BY LILLY.**

To succeed on a claim of negligent misrepresentation against a manufacturer, a plaintiff bears the burden of proving that the defendant: (1) in the course of its business; (2) supplied false information for the guidance of others; (3) in their business transactions; (4) causing and resulting in pecuniary loss to those others; (5) *by their justifiable reliance upon the information*; and (6) that it failed to exercise reasonable care or competence in obtaining or communicating

---

liability. *See* Federal Food, Drug, and Cosmetic Act, §§ 502, 503, 21 U.S.C. §§ 352, 353 (1938) (Weaver Aff., Ex. 10); Food and Drugs, 21 C.F.R. § 1.106 (1956 & Supp. 1960) (Weaver Aff., Ex. 11).

[5] Massachusetts requires a plaintiff in a negligence action to identify her tortfeasor. *See Payton v. Abbott Labs.*, 437 N.E.2d 171, 188-90 (1982) (stating that identification serves two important purposes: "it separates wrongdoers from innocent actors, and also ensures that wrongdoers are held liable only for the harm that they have caused"); *see also Santiago v. Sherwin Williams Co.*, 3 F.3d 546 (1st Cir. 1993).

the information. *Cummings v. HPG Int'l Inc.*, 244 F. 3d 16, 24 (1st Cir. 2001) (emphasis added) (applying Massachusetts law).

Just as in the claim of inadequate warning, Plaintiff's claim is based on alleged faults in Lilly's writings. Those writings, directed to prescribing doctors, cannot have caused any harm unless the prescribing doctor saw and relied on them. Because Plaintiff cannot prove that Dr. Montag read and detrimentally relied on warnings provided by Lilly, summary judgment is warranted in Lilly's favor on Plaintiff's claim for negligent misrepresentation.

**4. PLAINTIFF'S CLAIM FOR BREACH OF WARRANTY MUST FAIL BECAUSE PLAINTIFF CANNOT PROVE THAT ANY WARRANTY BY LILLY WAS READ OR RELIED UPON BY DR. MONTAG.**

Plaintiff alleges that Lilly breached both implied and express warranties. Although it is not entirely clear what breaches are being alleged, it is irrelevant because Plaintiff cannot prevail on a claim of breach of express warranty, a breach of the implied warranty of merchantability, or a breach of the implied warranty of fitness for a particular purpose.

**a. There is No Evidence that Dr. Montag Relied Upon Any Express Warranties Made By Lilly.**

Under Massachusetts law, "an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Mass. Gen. Laws c. 106 § 2-313. This requires that a plaintiff demonstrate that the targets of the express warranty knew that the warranty existed, read the warranty, and relied on its content. *See Sprague v. Upjohn*, Civ. A. No. 91-40035-NMG, 1995 WL 376934 at *3 (D. Mass. May 10, 1994) (quoting *Roth v. Ray-Stel's Hair Stylists, Inc.*, 470 N.E.2d 137, 138 (Mass. App. Ct. 1984)). Therefore, if no evidence is presented that Dr. Montag knew of and relied on the statements that Plaintiff alleges constitute an express warranty, Plaintiff's breach of express warranty claim must fail.

      **b. Because Claims for Breach of Implied Warranty of Merchantability Are Analyzed In Massachusetts Coextensively With Negligent Failure to Warn Claims, Plaintiff's Claim Can Not Succeed.**

In Massachusetts, liability for breach of an implied warranty of merchantability is "intended to be fully as comprehensive as the strict liability theory of recovery that has been adopted by a great many other jurisdictions." *Back v. Wickes*, 378 N.E.2d 964, 968-69 (Mass. 1978). However, Massachusetts law also mandates that a breach of warranty inquiry focused on warnings accompanying prescription medications be analyzed in negligence. *See Payton v. Abbott Labs., et al.*, 437 N.E.2d 171, 189-90 (Mass. 1982) (rejecting plaintiff's theory of strict liability, noting that "[p]ublic policy favors the development and marketing of new and more efficacious drugs. The Restatement (Second) of Torts recognizes this policy by rejecting strict liability in favor of negligence for drug related injuries."). Claims of negligent failure to warn and a breach of an implied warranty of merchantability are treated "as a single claim for failure to warn" purposes. *See, e.g. Sprague v. Upjohn*, Civ. A. No. 91-40035-NMG, 1995 WL 376934 * 3 (D. Mass. May 10, 1994) (quoting *MacDonald v. Ortho Pharm. Corp.*, 475 N.E.2d 65, 67-68 (Mass. 1985), *cert. denied*, 474 U.S. 920); *Hoffman v. Houghton Chemical Corporation*, 751 N.E.2d 848, 859 (Mass. 2001) ("[W]e implicitly recognized that negligent failure to warn and failure to warn under breach of warranty are to be judged by the same standard…We expressly recognize that convergence now.").

As discussed above in this Memorandum, Section III.C, *supra*, a claim of negligent failure to warn demands proof of reliance on "inadequate" warnings. Plaintiff has not produced any evidence that Dr. Montag read and relied on Lilly's warnings while treating Mrs. Manning, hence Plaintiff cannot prove that any alleged deficiency in those warnings proximately caused Mrs. Davis' harms. Because breach of warranty of merchantability claims based on a failure to warn are analyzed coextensively with negligent failure to warn claims, Plaintiff's claim for

breach of the warranty of merchantability based on a failure to warn must be dismissed. *See* Section III.C, *supra.*

**c. Because Plaintiff Cannot Prove Reliance By Dr. Montag On Lilly's Skill or Judgment in Treating Mrs. Manning, Plaintiff Cannot Bring A Claim for Breach of Implied Warranty of Fitness for a Particular Purpose.**

If Plaintiff instead intended to assert a claim for breach of an implied warranty of fitness for a particular purpose because of inadequate warnings, then that claim also must fail. Such a claim requires the consumer to prove that she relied on the manufacturer's knowledge, skill, and judgment in purchasing a product tailored to that consumer's specifications and that, as a result of such reliance, the consumer was injured. *See* Mass. Gen. Laws c. 106 s. 2-315 ("Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the ***seller's judgment to select or furnish*** suitable goods, there is...an implied warranty that the goods shall be fit for that purpose.") (emphasis added); *see also Johnson v. Brown and Williamson*, 122 F. Supp. 2d 194, 207 (D. Mass. 2000) ("Under M.G.L. c.106, § 2-315, the warranty of fitness for a particular purpose arises when 1) the seller had reason to know of the particular purpose for which the buyer required the goods, 2) the seller had reason to know of the buyer's reliance on the seller's skill or judgment in selecting or furnishing suitable goods, and 3) the buyer relied in fact."). Here, however, such a warranty was never created by Lilly as, again, there is no proof that Dr. Montag relied on *Lilly's* warnings, judgment, or skill.

**D. MASSACHUSETTS DOES NOT AWARD PUNITIVE DAMAGES.**

Plaintiff's claim for punitive damages must be dismissed. In the absence of a statute expressly authorizing punitive damages, Massachusetts courts are not permitted to grant such an award. *See City of Lowell v. Massachusetts Bonding & Ins. Co., et al.*, 47 N.E.2d 265, 271-72

(Mass. 1943) ("The damages awarded under such a rule are punitive. In this Commonwealth exemplary damages are not allowed unless authorized by statute."); *see also Boott Mills v. Boston & Maine R.R.*, 106 N.E. 680, 683-84 (Mass. 1914); *Ellis v. Brockton Pub. Co.*, 84 N.E. 1018, 1020 (Mass. 1908). No such statute exists that is applicable to this case, and therefore Plaintiff is not entitled to punitive damages.

## IV. CONCLUSION

For the foregoing reasons, Lilly respectfully requests this Court grant summary judgment in Lilly's favor. Lilly is entitled to judgment on all claims based upon allegedly inadequate warning, and claims of misrepresentation or breach of warranty premised on such warnings, for the reasons set out in this Memorandum.

## REQUEST FOR HEARING

Pursuant to LCvR 7.1(D), Lilly requests a hearing on its Motion for Summary Judgment.

Respectfully submitted,

ELI LILLY AND COMPANY

/s/ James J. Dillon

James J. Dillon
Foley Hoag LLP
155 Seaport Boulevard
World Trade Center West
Boston, MA 02210-2600
(617) 832-1000
Attorneys for Defendant
Eli Lilly and Company

Dated: July 15, 2005