UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

BARRY DAVIS, individually, and as Administrator
of the ESTATE OF LINDA MARIE DAVIS, deceased,

                *Plaintiff*,

vs.                                      Civil Action No.: 1:04-cv-10349-MEL

ELI LILLY AND COMPANY, an Indiana corporation,

                *Defendant.*

_____

---

**PLAINTIFF'S RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

PATRICIA MARTIN STANFORD, P.A.
Patricia Martin Stanford, Esquire
3609 Hendricks Avenue
Jacksonville, Florida 32207
904-346-4215
ATTORNEY FOR PLAINTIFFS

## TABLE OF CONTENTS

Page

I.    Introduction and Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

II.   Plaintiff's Response to Defendant's Statement of Undisputed Facts  . . . . . . . . -3-

III.  Plaintiff's Separate Statement of Undisputed Facts . . . . . . . . . . . . . . . . . . . . . -6-

IV.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

      A.    Summary Judgment is Improper Where Multiple Triable
            Issues of Fact Exist  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

      B.    Plaintiff Has Substantial Admissible, Irrefutable Evidence
            That Linda Davis Was Exposed to Diethylstilbestrol
            Manufactured by Eli Lilly . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

            1.    Plaintiff's Evidence of Linda Davis' Exposure to
                  Diethylstilbestrol . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

                  a.    Testimony and Medical Records of Linda Davis . . . . . -13-
                  b.    Testimony of Susan Zweizig, MD  . . . . . . . . . . . . . . . -14-
                  c.    Testimony of Linda Davis' Mother - Mrs. Manning . . -16-
                  d.    Testimony of Joyce Greenberg  . . . . . . . . . . . . . . . . . . -17-
                  e.    Sworn Statement of Daphne Abodeely . . . . . . . . . . . . -18-
                  f.    Testimony of Joseph Rossetti, RPh . . . . . . . . . . . . . . . -19-
                  g.    Sworn Statement of Russell Johnson, MD  . . . . . . . . . -20-
                  h.    Sworn Statement of Therese Silva  . . . . . . . . . . . . . . . -20-

            2.    Plaintiff's Evidence of Exposure is "Significantly Probative"
                  and Clearly Presents Multiple Triable Issues of Fact . . . . . . . . -21-

            3.    Plaintiff's Proffered Testimony and Medical Records are
                  Admissible Under Rules of Evidence and Various Hearsay
                  Exceptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-

                  a.    Federal Rules of Evidence 803(4),(6),
                        805, 807, and 1004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

(1)    Statement of Nurse Gendron Concerning
Mrs. Manning's Prescription of Stilbestrol  . . .  -26-

(2)    Mrs. Manning's Statements Concerning
Her Ingestion of DES . . . . . . . . . . . . . . . . . . . .  -30-

(3)    Mrs. Davis' Recorded Statements to Her
Treating Doctors  . . . . . . . . . . . . . . . . . . . . . .  -31-

b.    Evidence of Dr. Montag's Custom and Routine
Business Practice - FRE 406 . . . . . . . . . . . . . . . . . . .  -34-

C.    Massachusetts Recognizes the "Heeding Presumption" That Serves
as the Causal Link in a Failure to Warn Case  . . . . . . . . . . . . . . . . . .  -37-

1.    Defendant Has Submitted Absolutely No Evidence to
Rebut the Heeding Presumption  . . . . . . . . . . . . . . . . . . . . . .  -43-

2.    The Heeding Presumption Is Not Restricted to The Brand
Name Drug Context . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -46-

D.    The Affidavits of Ashley Weaver and Benjamin Sachs Must
Be Stricken  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -46-

E.    Plaintiff's Breach of Warranty and Negligent Misrepresentation
Claims Allowed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -51-

F.    Punitive Damages Allowed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -52-

V.    Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -53-

Table of Authorities

Index of Exhibits

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

BARRY DAVIS, individually, and as
Administrator of the ESTATE OF LINDA MARIE
DAVIS, deceased,

        *Plaintiff*,

vs.                        Civil Action No.: 1:04-cv-10349-MEL

ELI LILLY AND COMPANY,
an Indiana corporation,

        *Defendant.*

_____

**PLAINTIFF'S OPPOSITION AND MEMORANDUM OF LAW IN RESPONSE TO
DEFENDANT ELI LILLY AND COMPANY'S MOTION FOR SUMMARY JUDGMENT**

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

Contrary to Defendant's Motion[1], Plaintiff has substantial, incontrovertible, admissible evidence that his wife, Linda Davis, was exposed to the drug, diethylstilbestrol (DES), which caused her cancer, and ultimately, her death. Not only has Mrs. Davis' mother testified that the office of her obstetrician, Dr. Paul Montag, confirmed she had been prescribed diethylstilbestrol, but Plaintiff will produce testimony and record evidence from over a half-dozen other sources that clearly and consistently demonstrate that Linda Davis was exposed to the drug, including: testimony of Linda Davis herself; testimony of Susan Zweizig, MD, Mrs. Davis' treating gynecologic oncologist; testimony of Dr. Montag's

_____

[1] The Defendant, Eli Lilly and Company's Motion for Summary Judgment (Doc.#25) and its Memorandum of Points and Authorities in Support of its Motion for Summary Judgment (Doc.#25, Attachment #1) are hereinafter referred to as "Motion" and "Memorandum" respectively, for ease of reference.

daughter, Joyce Greenberg, who worked in his office and was familiar with his custom of prescribing the drug; testimony of Daphne Abodeely, another patient of Dr. Montag's during the same time frame as Mrs. Manning, who verified that he prescribed diethylstilbestrol for her troubled pregnancy and that she actually saw the name of the drug in her own medical records; testimony of Joseph Rossetti, RPh, a Worcester pharmacist, and Russell Johnson, MD, a Worcester physician, who have both testified that it was the custom among doctors in the area to prescribe diethylstilbestrol as a treatment for threatened abortion or a history of miscarriage. In addition, Linda Davis' own medical records as far back as 1981 contain notations regarding her DES exposure. All of this testimony and record evidence is admissible under one or more exceptions to the hearsay rule, and its cumulative weight, credibility and consistency make it clear that summary judgment cannot be rendered in this case.

Defendant's position that Plaintiff must prove Dr. Montag's reliance on the Lilly product literature is likewise without merit. Massachusetts law is clear that a plaintiff in a pharmaceutical product liability case is entitled to the presumption that an adequate warning, *if given* by a manufacturer, will be read and heeded. Where the warning is inadequate or where there is no warning at all, this "heeding" presumption arises to satisfy the Plaintiff's burden of proving that the lack of proper warning was a proximate cause of the ingestion of the drug. The Plaintiff in this DES case, as in any drug product case, is entitled to rely on the heeding presumption to fulfill this causal link. A defendant may in turn attempt to rebut the presumption, but to do so, the evidence submitted must be clear and unequivocal. Even

testimony by the prescribing physician that he would not have followed a warning has been deemed inadequate by Massachusetts courts. Here, the Defendant has submitted absolutely nothing in support of its argument. Indeed, Dr. Montag's daughter has testified that he met with many drug company detailmen and always read the product literature and materials he was supplied by them. Questions of proximate cause generally present issues for the jury to decide, and since Plaintiff has raised the existence of numerous genuine issues of material fact, the Defendant's Motion must be denied on this ground as well.

Plaintiff will also demonstrate that the affidavits of Ashley Weaver and Benjamin Sachs, together with the documents attached thereto, must be stricken and disregarded by the Court. (Doc. #25, Attachment #2; Doc. #26) The affidavits are not, and could not be, based upon the personal knowledge of the affiants, and the documents attached are inadmissible, unauthenticated hearsay and prejudicial to Plaintiff.

## II.    PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

Plaintiff hereby responds to Defendant Eli Lilly's ("Lilly") Statement of Undisputed Facts as set forth in its Motion and lists additional undisputed facts of his own:

1.    Plaintiff's Complaint and Amended Complaint speak for themselves. However, Plaintiff admits that he filed an amended complaint for the wrongful death of his wife on behalf of himself, his children and her estate.

2.    Admitted that Dorothy White Manning, the mother of decedent Linda Davis was prescribed diethylstilbestrol by her obstetrician, Dr. Paul Montag, in 1960. Admitted that Dr. Montag is deceased.

3.    Admitted that Mrs. Manning does not recall what the pill she took looked like.

4.    Denied. Mrs. Manning's deposition testimony as a whole speaks for itself and is improperly characterized here. Mrs. Manning did testify that Dr. Montag's nurse advised her that the medication she was prescribed during her pregnancy with Linda Davis "...was called Stilbestrol at the time and it's on your chart, you did take the Stilbestrol." **Exhibit A**, Deposition of Dorothy Manning at 39.

5.    Denied. Mrs. Manning's deposition testimony as a whole speaks for itself and is taken out of context and improperly characterized here. *See* response to No. 4 above.

6.    Denied. The affidavits of Ashley Weaver and Benjamin Sachs, MD, must be stricken as they are not based on personal knowledge and the documents they purport to reference are not properly authenticated. Dr. Sachs was 9 years old at the time of the events relevant to this action, and Ms. Weaver was not yet born. *See* argument, *infra*, Section D.

7.    Denied. If, as Defendant argues, "DES" is an umbrella term not exclusive to any one particular drug, it is impossible to state that "it" was never patented. Plaintiff does admit that *diethylstilbestrol* was a generic drug, but does not admit the remainder of this statement. Moreover, citation to a court opinion is not evidence of the truth of the statement.

8.    Denied. This is argument, not fact, and is absolutely unsupported. Dr. Sachs' affidavit is nothing more than a recitation of this same "fact", and as set forth above, and explained *infra*, at Section D, his affidavit is inadmissible and must be stricken.

9.    Denied for the same reasons set forth in response to No. 8.

10.    Denied for the same reasons set forth in response to No. 8. Dr. Sachs was not

-4-

involved in the creation of the DESAD project, so he has no personal knowledge to support his statements as to why the project "was created", how the terms were defined, or any other matter regarding the project. *See* argument, *infra*, at Section D as to why the affidavit must be stricken.

11.    Denied for the same reasons set forth in response to No. 8. Moreover, attorney Weaver has even less personal knowledge concerning the matters she purports to attest to in her affidavit which should likewise be stricken. *See* argument, *infra,* at Section D.

12.    Admitted.

13.    Denied, the documents that Defendant relies on for these *allegations* (not facts) are hearsay, inadmissible under any exceptions to the hearsay rule, unauthenticated and irrelevant. Attorney Weaver's Affidavit to which they are attached must be stricken. *See* argument, *infra*, Section D.

14.    Denied. *See* **Exhibit A**, Deposition of Dorothy Manning; **Exhibit B,** Deposition of Joyce Greenberg; **Exhibit C**, Affidavit of Daphne Abodeely; **Composite Exhibit D**, Deposition and Sworn Supplemental Statement of Joseph Rossetti, RPh; **Exhibit E**, Affidavit of Russell Johnson, MD; and **Exhibit N**, Affidavit of Therese Silva with Attached Excerpts of Medical Records from George F. Clancy, MD.

15.    Denied as worded. Plaintiff's Amended Complaint speaks for itself.

16.    Denied, as the specific law and regulations applicable and relevant to Defendant's conduct in 1960 and 1961 is a legal issue for determination by the Court.

17.    Denied, insofar as this statement is vague and relies on the Affidavit of Attorney

Weaver and its unauthenticated, irrelevant attachments.

18.    Denied. It is not Plaintiff's burden to produce evidence of the type referred to in this paragraph. Moreover, Defendant's product literature did not include *any* warnings as to the risks of its diethylstilbestrol to the patient and/or her fetus, so it would be impossible for Plaintiff to prove that such a warning was read by anyone. Moreover, Joyce Greenberg has testified that her father was visited by many drug company detailmen and read the product literature left by them. **Exhibit B**, Deposition of Joyce Greenberg, at 21-22.

## III.  PLAINTIFF'S SEPARATE STATEMENT OF UNDISPUTED FACTS

1.    Linda Marie Davis was born April 13, 1961 and died on May 19, 2004 of vaginal cancer. **Composite Exhibit F**, Certified copy of Birth Certificate and Certificate of Death of Linda Marie Davis.

2.    Barry and Linda Davis were continuously married from October 6, 1984 to the date of Linda Davis' death. **Exhibit G**, Plaintiff's Answers to Eli Lilly and Company's First Set of Interrogatories, No. 3.

3.    Barry and Linda Davis had two children together: Brittany Lynn Davis, DOB 2/27/91 and Matthew E. Davis DOB 2/14/95. **Exhibit G,** Plaintiff's Answers to Eli Lilly and Company's First Set of Interrogatories, No. 15.

4.    Dorothy White Manning, the mother of Linda Davis, has testified that Paul Montag, M.D. was her obstetrician during her pregnancy with Linda Davis. **Exhibit A,** Deposition of Dorothy Manning at 36-37.

5.    Mrs. Manning has testified that she had two miscarriages prior to her pregnancy

with Linda Davis.  **Exhibit A**, Deposition of Dorothy Manning at 33, 36.

6.    Mrs. Manning has testified that Dr. Montag prescribed a medication for her during her pregnancy with Linda Davis, and he told her it would "hold the baby" and "it's been proven that it works." **Exhibit A**, Deposition of Dorothy Manning at 37.

7.    Mrs. Manning has testified that Dr. Montag said that he had given the drug before and it worked. **Exhibit A**, Deposition of Dorothy Manning at 44.

8.    Mrs. Manning has testified that she confirmed with the nurse at Dr. Montag's office that she had been prescribed "stilbestrol" during her pregnancy with Linda Davis. **Exhibit A**, Deposition of Dorothy Manning at 38-39.

9.    Joyce Greenberg, the daughter of Dr. Montag, has testified that Dorothy White was a patient of her father's practice, and that it was her father's custom to prescribe diethylstilbestrol to patients who had problematic pregnancies or a history of miscarriage. **Exhibit B**, Deposition of Joyce Greenberg at 16, 23-24.

10.    Daphne Abodeely, another patient of Dr. Montag's, has given a sworn statement that he prescribed the drug, diethylstilbestrol, to her during her pregnancy in 1961-62 in order to prevent miscarriage, and that she specifically recalls that it was in fact *diethylstilbestrol*, as opposed to any other hormonal medication. **Exhibit C**, Affidavit of Daphne Abodeely.

11.    Joseph Rossetti, RPh, the pharmacist who filled Dorothy White Manning's prescription for diethylstilbestrol, has testified that diethylstilbestrol was commonly used by OB/GYNs in the Worcester area during the late 1950s and 1960s as a medication to prevent miscarriage, and that he filled many such prescriptions. His own wife was prescribed

diethylstilbestrol by her obstetrician, Dr. George F. Clancy in Worcester. **Composite Exhibit D,** Sworn Supplemental Statement of Joseph Rossetti, RPh at ¶¶ 8-9.

12.    Joyce Greenberg testified that Dr. Clancy covered for her father at times since he had a busy practice.    **Exhibit B**, Deposition of Joyce Greenberg at 34.

13.    Russell Johnson, MD is an obstetrician/gynecologist still practicing in Worcester who has given a sworn statement that he was familiar with Dr. Montag and that diethylstilbestrol was commonly used by physicians in the Worcester area in the 1950s and 60s as a treatment for threatened abortion or a history of miscarriage. **Exhibit E**, Affidavit of Russell Johnson, MD.

14.    Linda Davis has testified that three of her doctors told her that they believed she was DES-exposed based on their physical examinations of her. **Exhibit H**, Deposition of Linda Davis at 25-27, 32.

15.    The medical record of one of Linda Davis' first gynecologic exams at age 19 notes "MOTHER TOOK DES WHILE PREGNANT WITH HER."   The medical record of an 11/9/89 visit by Linda Davis to the Fallon Clinic notes "DES daughter." A 2/27/91 record from Linda Davis' first pregnancy notes "DES exposed *in utero*." The medical record of an 8/26/98 visit by Mrs. Davis to Dr. Russell Young notes "History DES exposure." **Composite Exhibit I,** Affidavit of Patricia M. Stanford, Esquire with Attached Excerpts of Medical Records from Lucille D. Pohley, M.D., Fallon Clinic, Saint Vincent Hospital, n/k/a Worcester Medical Center, and E. Russell Young, D.O.

16.    Dr. Susan Zweizig, the gynecologic oncologist who diagnosed and treated Mrs.

Davis' cancer, has testified that in her opinion, the cause of Mrs. Davis' vaginal clear cell adenocarcinoma  and, ultimately, her death, was *in utero* exposure to diethylstilbestrol (DES). **Composite Exhibit J**, Deposition of Susan Zweizig MD at 9-10 and Expert Report of Susan Zweizig, MD dated March 25, 2005 referenced therein.

17.    Diethylstilbestrol  made by Eli Lilly and Company for use in the prevention of "certain accidents of pregnancy" was available for sale in Worcester, Massachusetts in 1960-1961. **Composite Exhibit K**, Eli Lilly and Company's Responses to Plaintiff's First Set of Interrogatories, No. 5, 8; **Composite Exhibit D**, Deposition of Joseph Rossetti, RPh, at 15,16.

18.    John Breen and Maurice Goulet were sales representatives for Eli Lilly and Company who called on Boulevard Pharmacy, Hahnemann Hospital and the medical office of Dr. Montag during the time of Dorothy White Manning's pregnancy with Linda Davis. **Composite Exhibit K**, Eli Lilly and Company's Responses to Plaintiff's First Set of Interrogatories, No. 7.

19.    Joseph Rossetti, RPh has testified that he and his father were good friends of John Breen, the Lilly representative during the 1950s and 1960s, who often visited their drug store, Boulevard Pharmacy. **Composite Exhibit D,** Deposition of Joseph Rossetti, RPh at 19.

20.    Joseph Rossetti, RPh has testified that his pharmacy, Boulevard Pharmacy in Worcester, dispensed only the Eli Lilly brand of diethylstilbestrol. **Composite Exhibit D**, Deposition of Joseph Rossetti, RPh at 20.

21.    Joyce Greenberg has testified that her father, Dr. Montag, visited with many sales

representatives from drug companies and always read the product literature they left with him. **Exhibit B**, Deposition of Joyce Greenberg at 20, 21.

22.    Joyce Greenberg has testified that her father, Dr. Montag, would not have prescribed ay medication to a pregnant patient if he felt it posed serious potential risks to her child. **Exhibit B**, Deposition of Joyce Greenberg at 32-33.

23.    Eli Lilly and Company's 1960-61 diethylstilbestrol product labeling and literature contained no warning of potential risks to the mother or to her fetus. **Exhibit L,** Supplemental Statement of Brian Strom, MD, MPH; **Exhibit M,** Lilly's Diethylstilbestrol Listing in the 1960 and 1961 editions of the Physicians' Desk Reference.

24.    Defendant has no witnesses or records indicating that diethylstilbestrol manufactured by any drug company other than Lilly was stocked at Boulevard Pharmacy in Worcester, MA in 1960-61. **Composite Exhibit K**, Eli Lilly and Company's Responses and Supplemental Responses to Plaintiff's Interrogatories No.11-14, 20.

25.    Attorney Ashley Weaver was not alive at the time of Linda Davis' gestation and has no personal knowledge of what diethylstilbestrol was used for, who made it, or what other medications were or were not used as treatment for threatened or habitual abortion or a history of miscarriage during that time period. *See* Attorney Biography at http://foleyhoag.com/attorney.asp?aID=000325149901.

26.    Benjamin Sachs, MD was 9 years old and living in England at the time of Linda Davis' gestation and has no personal knowledge of what diethylstilbestrol was used for, who made it, or what other medications were or were not used as treatment for threatened or

habitual abortion or a history of miscarriage during that time period. *See* Curriculum Vitae

of Benjamin Sachs, filed in support of Defendant's Motion, (Doc.#26).

## IV.  ARGUMENT

### A.  SUMMARY JUDGMENT IS IMPROPER WHERE MULTIPLE TRIABLE ISSUES OF FACT EXIST

Plaintiff agrees generally with the Rule 56 summary judgment standard stated in

Defendant's Memorandum. However, the initial burden is on the moving party to

demonstrate the complete absence of a genuine issue of material fact in order to be entitled

to judgment as a matter of law, and this Court has a duty to look at the record in the light

most favorable to the non-moving party and to indulge all inferences in his favor. *Carmona*

*v. Toledo,* 215 F.3d 124, 132 (1st Cir. 2000)(citations omitted); *Shields v. Eli Lilly & Co.*, 895

F.2d 1463, 1465 (D.C. Cir. 1990); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975).The

burden of coming forward with evidence shifts to the nonmoving party *only* if the summary

judgment motion is properly supported. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970).

Defendant's Motion is not substantiated since it is based only on improper affidavits given

without personal knowledge. Nonetheless, Plaintiff has presented substantial testimony and

documentary evidence in support of his claims. "If, after canvassing of the material

presented, the district court finds that *some* genuine factual issue remains in the case, whose

resolution one way or another *could* affect its outcome, the court must deny the motion."

*Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988)(emphasis in original).

This fact-intensive case is clearly not a proper vehicle for summary disposition. Dozens of

material facts give rise to dozens more reasonable inferences, any or all of which create

-11-

triable issues of fact for a jury –not a court– to decide. *See, e.g., Uloth v. City Tank Corp.*, 384 N.E.2d 1188 (Mass. 1978); *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652 (1st Cir. 1981); *Garside v. Osco Drug*, 976 F.2d 77 (1st Cir 1992).

Neither does Defendant's contortion of the Massachusetts heeding presumption present an opportunity for summary judgment. Lilly claims that Plaintiff must prove that Dr. Montag relied on their non-existent warnings. In addition to being logically baffling, their argument is without support in the law. Once a plaintiff submits evidence of the defendant's failure to warn, the presumption applies. The standard required for a defendant to rebut the presumption is exceedingly high, and this Defendant has produced absolutely nothing to do so, thus its Motion must be denied on this ground also.

### B.     PLAINTIFF HAS SUBSTANTIAL ADMISSIBLE, IRREFUTABLE EVIDENCE THAT LINDA DAVIS WAS EXPOSED TO DIETHYLSTILBESTROL MANUFACTURED BY ELI LILLY

Plaintiff will present the testimony of more than a half-dozen witnesses, together with numerous, consistent entries in his wife's medical records, all of which are admissible and incontrovertible and clearly demonstrate that his wife was exposed to diethylstilbestrol (hereinafter Plaintiff may use the term "DES" to refer <u>only</u> to the drug, diethylstilbestrol). Despite Defendant's efforts to confuse the issue, DES was coined as a shorthand term in the early 1970s, and it is clear that it came from the word diethylstilbestrol: <u>D</u>i - <u>E</u>thyl - <u>S</u>tilbestrol. *See, e.g.*, STEDMAN'S MEDICAL DICTIONARY, 25th ed. (1990) at 421; TABER'S CYCLOPEDIC MEDICAL DICTIONARY, 16th ed. (1989) at 485, 501; THE MERCK MANUAL, 15th ed. (1987) at 1225, 1730.

-12-

1.    **Plaintiff's Evidence of Linda Davis' Exposure to Diethylstilbestrol**

a.    *Testimony and Medical Records of Linda Davis*

Linda Davis testified at her deposition that her first gynecologist, Dr. Halpin, had a long talk with her and explained to her that her mother had taken "stilbestrol" because of her history of miscarriage. **Exhibit H**, Deposition of Linda Davis at 17-18. He instructed her to always let her subsequent doctors know that she was DES exposed. *Id*. at 16-17. She did that at every examination. Three of the doctors she saw for gynecologic care in turn told her that, based on their examinations, they agreed that she was DES exposed. *Id*. at 25-27, 32. Dr. Pohley was one of her first gynecologists and, after a pelvic exam performed on 3/2/81, told Linda that she thought she was DES exposed. *Id*. at 26. Dr. Pohley placed a note in Linda's medical records that stated: "MOTHER TOOK DES WHILE PREGNANT WITH HER." **Composite Exhibit I**, Affidavit of Patricia M. Stanford, Esquire with Attached Excerpts of Medical Records. Several years later, at a routine annual exam Linda received at The Fallon Clinic, records again note "DES daughter." *Id.*

When Linda delivered her first child, her obstetrician, Dr. Aversa, noted in a 2/27/91 medical record that she was "DES exposed *in utero*." *Id.* Linda testified that she had told Dr. Aversa of her exposure history and he had previously agreed that, based on her anatomy, she was DES-exposed. He told her that she had a very small cervix that was likely the result of the exposure. **Exhibit H**, Deposition of Linda Davis at 27.

Dr. Russell Young was Linda's primary care doctor beginning in the early 1990s. She

-13-

told Dr. Young that she was a DES daughter and he told her that it was something he would keep his eye out for during her exams. *Id.* at 30. A medical record of an 8/26/98 visit by Linda to Dr. Young notes "History DES exposure." **Composite Exhibit I**, Affidavit of Patricia M. Stanford, Esquire with Attached Excerpts of Medical Records. By charting her history, it was obvious he felt that her exposure was information that was important to his treatment of her. This later proved to be exactly the case.

Although Linda had never previously experienced an abnormal Pap smear while treating with Dr. Young, suspicious results from a 10/31/00 Pap, coupled with her known DES exposure, led led Dr. Young to refer Linda to a gynecologist for further specialized treatment. **Exhibit H**, Deposition of Linda Davis at 30-31. She ultimately came under the care of Susan Zweizig, MD, a gynecologic oncologist at U Mass Memorial's cancer center. After numerous tests, including colposcopy and biopsies, Dr. Zweizig advised Linda of the awful news that she had a rare form of vaginal cancer, known as clear cell adenocarcinoma. *Id.* at 32-33. Dr. Zweizig told her that the only known cause of this form of cancer was exposure to diethylstilbestrol, and that Linda's exposure to the drug was the cause of her cancer. *Id.*

    **b.**    **Testimony of Susan Zweizig, MD - Linda Davis' treating oncologist**

Dr. Zweizig has herself testified that the numerous abnormalities Linda exhibited on vaginal examination led her to conclude that Linda was indeed exposed to diethylstilbestrol which caused her cancer. **Composite Exhibit J**, Expert Report of Susan Zweizig, MD. Because her testimony was so descriptive of these unique abnormalities and their clear

association with diethylstilbestrol exposure, a substantial portion of it is included here:

> Linda Davis had many stigmata that are associated with DES exposure; not only did she have the maternal history which is substantiated by her mother's personal account as well as her own presenting sort of consistent knowledge and medical documentation that she was a DES daughter. So you have her mother's recall. You have Linda saying from a very early age that she was a DES daughter. So this was not an exposure that was dreamed up after her diagnosis of clear-cell carcinoma of the vagina. And in addition...on pelvic exam, she had a *very abnormal appearing upper genital tract.* Her *cervix was very tiny*, retracted backwards...*[I]t was almost as if there was a hood or a collar in the vagina*...This is at the upper vagina, remote from where the malignancy was. She also had widespread *adenosis* going across her vagina and her cervix; *very, very impressive adenosis.* And then all of this continued downward and along the vagina to the point of where the malignancy was...She also had a history of having had a Cesarean section for a child that was not abnormally large...women who are DES exposed are known to have sort of *higher risk and higher percentage of dysfunctional labor* and needing things like Cesarean sections for delivery of their pregnancies...I also would like to point out that the type of clear-cell carcinoma that Linda had was the tubular type and it's thought that this tubular type is actually a mullerian origin. Mullerian tracts are tracts that are present in early embryologic development at the time when the baby is forming inside the mother's uterus...That's what causes the adenosis is that the DES is thought to bind very strongly to these growing mullerian tracts and that's what causes the areas of adenosis...When her pathology was reviewed at our institution, the pathologist said *it was a classic case.* She was brought forth so that all medical students could see it, all the residents. We discussed her pathology at conferences as *classic clear-cell carcinoma in a DES-exposed woman* because of this tubular pattern of the clear-cell carcinoma as well as the absence of any other type of HPV-related neoplasia within the specimen. Also, we reviewed her adenosis and similarly talked about how that was *classic for a DES-exposed woman.* Her pathology was reviewed at the Mass General Hospital by Robert Young who is probably the premier gynecologic pathologist,...definitely in Massachusetts, but many people would say in the world. And he also made note of that correlation with it being of mullerian origin and of that tubular pattern that is *very characteristic of DES-exposed women.*

**Composite Exhibit J**, Deposition of Susan Zweizig, MD at 19-22 (emphasis added).

Vaginal adenosis, a hypoplastic or otherwise distorted cervix, pregnancy complications and clear cell adenocarcinoma of the vagina are all strongly and commonly associated in the

medical literature with exposure to diethylstilbestrol. *See, e.g.*, F.G. Cunningham, MD, et al, WILLIAMS OBSTETRICS,19th ed. (Appleton & Lange 1993) at 728-29. As Dr. Zweizig noted, any OB/GYN or gynecologic oncology textbook will have a section about the classic epidemiological relationship between diethylstilbestrol exposure and clear cell cancer, as well as other physical implications of exposure. **Composite Exhibit J**, Deposition of Susan Zweizig, MD at 26.

### c.    Testimony of Linda Davis' Mother - Mrs. Manning

Dorothy White Manning had two miscarriages prior to becoming pregnant with her daughter, Linda. She testified that she made an appointment to see her obstetrician, Dr. Montag, as soon as she suspected she was pregnant again because she wanted to avoid suffering another loss. **Exhibit A**, Deposition of Dorothy Manning at 37. Dr. Montag had her come in to his office right away. *Id.* At her first appointment, Dr. Montag prescribed a drug that he had used before with success that he told Mrs. Manning would "hold the baby". *Id.* at 38, 44. Although she did not recall the name of the drug, Mrs. Manning confirmed with the nurse at Dr. Montag's office years later that she had indeed been prescribed "stilbestrol" - the commonly used term for diethylstilbestrol at that time. *Id*. at 39. The nurse had consulted Mrs. Manning's records and then told her "that pill..it was called stilbestrol at the time and it's on your chart, you did take the Stilbestrol." *Id.* The nurse then advised Mrs. Manning to have Linda seen by a gynecologist and to establish a regimen of annual examinations for her. *Id.* at 39. Based on that advice, Mrs. Manning took Linda to see a gynecologist, Dr. Halpin, who also advised Linda that she had been exposed to stilbestrol. **Exhibit H**, Deposition of

Linda Davis at 16, 17.

      **d.    Testimony of Joyce Greenberg - Daughter of Paul Montag, MD**

Plaintiff will also present the testimony of Joyce Greenberg, the daughter of Mrs. Manning's obstetrician, Paul Montag MD. Mrs. Greenberg has given two sworn statements as well as deposition testimony, all of which consistently state that it was her father's custom and practice to prescribe the drug diethylstilbestrol– not any other medication--to his patients who had a history of troubled pregnancies or miscarriage. **Exhibit B**, Deposition of Joyce Greenberg.  Mrs. Greenberg advised that Dr. Montag's obstetric records were destroyed some time ago, but she does have a journal in which he listed the names of all the patients for whom he delivered babies. *Id.* at 25, 26, 33. Mrs. Manning is listed as a patient who delivered a baby girl on April 13, 1961 - Linda Davis' date of birth. *Id.*

Mrs. Greenberg's testimony is based upon her personal knowledge. She grew up in the house where her father also conducted his medical practice and worked from time to time in his office greeting patients, escorting them to waiting rooms, taking and recording blood pressure readings, making notations in and filing charts, and other tasks of that sort. *Id.* at 14. Her familiarity with her father's prescribing practices is based in part on the fact that a friend of hers was prescribed diethylstilbestrol during her pregnancy in 1961-62. She also recalled that during the years after it became known that diethylstilbestrol use might cause cancer in the daughters of women who had taken it, her father received many calls from concerned patients about the drug. *Id.* at 38. He and/or his nurse, Mary Gendron, would consult the charts and confirm the exposure for people who called. *Id.* She testified that it is the

combined memories of her work in his office, her friend's ingestion of the drug and the later calls from patients that formed the basis of her knowledge that her father prescribed diethylstilbestrol as opposed to some other form of medication. *Id.* at Def.'s Exhibit 1 to Deposition. Clearly, this firsthand knowledge of events at her father's office and his custom and practice are admissible statements of fact which in turn give rise to a reasonable inference that Linda Davis' mother was prescribed diethylstilbestrol, as opposed to any other anti-miscarriage medication. Mrs. Greenberg's testimony also corroborates Mrs. Manning's explanation as to how she learned that she had taken diethylstilbestrol.

> **e.    Sworn Statement of Daphne Abodeely, a patient of Dr. Montag**

Daphne Abodeely has given sworn testimony that she was a patient of Dr. Montag's practice during her pregnancy with her daughter during 1961 and 1962. **Exhibit C**, Affidavit of Daphne Abodeely. During that time, he prescribed the drug, diethylstilbestrol, for her to take during the pregnancy in order to prevent miscarriage. *Id.* She specifically recalls that the drug prescribed was in fact diethylstilbestrol, as opposed to any other hormonal medication because that is the term that Dr. Montag used to refer to the drug when prescribing it for her. *Id.* Moreover, she also knows that she took the Lilly brand of the drug. *Id.* When information became public about the health risks of the drug, Mrs. Abodeely obtained her medical records from Dr .Montag's office in order to confirm what she had taken, and she specifically recalls seeing the term "diethylstilbestrol" in the medical records. *Id.* Because she had taken the drug during pregnancy, she took her daughter to be seen at Mass General in Boston where a study of exposed daughters was being conducted by Dr. Ann Barnes. They also confirmed

-18-

to her that she had been prescribed diethylstilbestrol by Dr. Montag. *Id*.

Mrs. Abodeely's testimony is admissible and relevant on the issue of Dr. Montag's prescription habits with respect to diethylstilbestrol. Her specific, unbiased testimony gives rise to reasonable inferences that diethylstilbestrol was the drug that Dr. Montag prescribed for Mrs. Manning.

### f.    Testimony and Sworn Statement of Joseph Rossetti, RPh

Not only has he testified definitively that the pharmacy where Mrs. Manning's prescriptions for DES were filled carried ONLY the Eli Lilly brand, but Mr. Rossetti has also testified regarding the custom and practice of Worcester physicians to prescribe DES, rather than other drugs, as a preventive treatment for miscarriage. **Composite Exhibit D**, Deposition of Joseph Rossetti, RPh at 14-16. Mr. Rossetti has been in the pharmacy business, at the same location at Boulevard Pharmacy, for over 50 years; first, as a stock boy and clerk for his father, then as a pharmacy school intern, and finally as a pharmacist and owner of the family business. He has testified that he and his father before him were close friends with John Breen, the representative from Lilly:

> He was our salesman for years and years, and anything...that he carried my father would buy from him. In those days we -- we didn't buy generics at all, and, in fact, even -- even things that were available generically we would buy from a brand company. And anything that Lilly made we would buy from Lilly.

*Id.* at 19.

Mr. Rossetti has testified that diethylstilbestrol was the drug that Worcester doctors most commonly prescribed as a miscarriage preventative and he filled many prescriptions for it. Even his own wife took the drug during pregnancy when it was prescribed by her

obstetrician, Dr. George F. Clancy. Mr. Rossetti has already been subjected to cross-examination; his testimony regarding the custom and practice of Worcester physicians to prescribe DES for at-risk pregnancies is based on his own personal knowledge and is reliable and trustworthy. It also gives rise to reasonable inferences that the most likely medication prescribed to Mrs. Manning was diethylstilbestrol.

### g.    Sworn Statement of Russell Johnson, MD

Unfortunately, most of the obstetricians who practiced in Worcester during the 1950s and early 1960s are deceased. After an exhaustive investigation, Plaintiff has located Dr. Russell Johnson who was first licensed as a physician in 1957 and began practicing in Worcester in 1963. He knew Dr. Montag and they had privileges at the same hospitals. He has stated that it was common practice among Worcester OB/GYNs to prescribe diethylstilbestrol as a miscarriage preventative during the 1950s and 1960s. **Exhibit E**, Affidavit of Russell Johnson, MD. His statements of fact give rise to further reasonable and logical inferences that the drug prescribed to Mrs. Manning was diethylstilbestrol.

### h.    Affidavit of Therese Silva, a patient of George Clancy, MD

Finally, Plaintiff will present the sworn testimony of Therese Silva, a patient of Dr. George Clancy, an obstetrician who practiced in Worcester in the 1950s to the 1980s. Mrs. Silva had a long and difficult obstetric history and suffered several miscarriages in between successful pregnancies. She has the original chart of her pregnancy with her daughter during 1954, and the records clearly show that Dr. Clancy prescribed "Stilbestrol" to her throughout the pregnancy. **Exhibit N**, Affidavit of Therese Silva with Attached Excerpts of Medical

Records. She also recalls that Dr. Clancy specifically told her the name of the drug he was prescribing to her because of her history of miscarriage. Mrs. Silva's testimony is consistent and confirmative of Mr. Rossetti's and Dr. Johnson's statements that doctors in Worcester prescribed DES. Of particular note, however, is that Dr. Clancy is the same doctor who prescribed diethylstilbestrol to Mr. Rossetti's wife during her pregnancy, and the same doctor who Joyce Greenberg said shared patient coverage with Dr. Montag. **Exhibit A**, Deposition of Dorothy Manning at 34. This gives rise to a reasonable inference that both doctors followed the common practice of prescribing diethylstilbestrol in problem pregnancies.

### 2. Plaintiff's Evidence of Exposure is "Significantly Probative" and Clearly Presents Multiple Triable Issues of Fact

Defendant asserts that Plaintiff's claims must fail because he has no admissible evidence that his wife was exposed to diethylstilbestrol. However, there is substantial case law, both in DES cases and others, to support the conclusion that the type of evidence presented by Plaintiff is more than sufficient to create triable issues of fact regarding her exposure.

In a case of striking factual similarity, the plaintiff in *Shields v. Eli Lilly*, 895 F.2d 1463 (D.C. Cir.1990) sued Lilly after contracting clear cell cancer she alleged was caused by her *in utero* exposure to its DES. Lilly moved for summary judgment, claiming that plaintiff could not prove she was exposed. Like the instant case, her mother could not recall the name of the drug she was prescribed, the doctor who prescribed it was deceased, and both his records and those of the pharmacy that dispensed the medication had been destroyed. The

-21-

plaintiff proposed to identify the medication as DES, based upon her mother's description of the medication, the reason for which it was prescribed, and the custom and practice of the doctor who prescribed it. Her mother testified that she took a small, red pill, the doctor's nurse testified that he prescribed either DES or progesterone for threatened miscarriage, and a pharmacy expert testified that DES was the only miscarriage preventative at that time that came in the form of red pills. *Id*. at 1465. The plaintiff also produced the medical records of a number of her treating physicians who had examined her both before and after her cancer diagnosis and noted that she was DES-exposed. *Id.* The doctor  who diagnosed her with cancer noted that she had accompanying "typical DES-associated changes." *Id*.

The trial court granted the defendant summary judgment, ruling that plaintiff had not presented sufficient evidence that she was exposed to DES, because none of the affidavits she offered--either separately or in combination--conclusively supported exposure. *Id*. at 1466. The Court of Appeals reversed, stating that:

> [t]he trial court has changed the burden of proof into a certainty of proof. It held that none of the evidence, even if fully credited, could disprove the possibility that appellant had not been exposed to DES and that her condition was the product of other forces. That is not the law.

*Id.*

Relying on *Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986), the appellate court stated that a trial court may grant summary judgment only if there is no "significantly probative" evidence tending to support the complaint. The "significantly probative" test does not require the nonmoving party to discredit every conceivable alternative theory of causation. *Shields*, 895 F.2d at 1465. Rather, the evidence need only be sufficient to permit

a reasonable juror, indulging all reasonable inferences, to find that the party proved the element at issue. *Id.* In reversing summary judgment, the *Shields* court discussed the plaintiff's burden and the jury's role in complex litigation, stating:

> In a world short of absolutes, the jury is called upon to process less than perfect evidence... Appellant produced more than sufficient evidence for a reasonable juror to conclude that she had been exposed to DES...This evidence was significantly probative of exposure. Every conceivable alternative theory of causation need not be extirpated by a litigant seeking the jury's decision.

*Id.* at 1467.

Here, Plaintiff has produced evidence very similar to that relied upon by Ms. Shields, *and more.* It is abundantly clear that this is a fact intensive case that cannot possibly be summarily decided. Any one of the many evidentiary statements and documents could well be sufficient for a reasonable juror to conclude that it was more likely than not that Linda Davis was exposed to diethylstilbestrol. In addition to Mrs. Manning's testimony and Linda Davis' medical records describing her DES exposure, Plaintiff has presented the corroborative testimony of Dr. Montag's daughter as well as a former patient of his who was also exposed to DES. He has even produced testimony that it was the custom and practice of obstetricians in the Worcester area to prescribe DES. All of this, together with the testimony of Mrs. Davis' treating oncologist that she had significant DES stigmata in addition to the rare form of cancer itself, compels the conclusion that she was DES exposed. As the *Shields* court noted, a trial judge must consider the *cumulative effect of the evidence* and grant all reasonable inferences to the nonmoving party, *Id.* at 1465, citing *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 39-40 (D.C.Cir.1987); *Exxon Corp. v. FTC*, 663 F.2d 120, 126 (D.C.Cir.1980).

Prior to the decision in *Shields, supra*, the Ninth Circuit Court of Appeals had come to the same conclusion in another DES case with the same issue of proof of exposure. *Bulthuis v. Rexall Corp.*, 789 F.2d 1315 (9th Cir.1986). In *Bulthuis*, plaintiff sued makers of DES after contracting clear cell cancer she alleged was caused by her *in utero* exposure to the drug. Defendants filed motions for summary judgment, claiming that plaintiff could not prove she had been exposed to diethylstilbestrol. They supported their motions with testimony from plaintiff's mother's treating physician who stated that he generally prescribed progesterone, not DES, to prevent miscarriage. *Id.* at 1318. Plaintiff opposed the motion by submitting affidavits of her treating physicians who gave the opinion that she was DES exposed based on tissue changes of the vagina. *Id.* at 1317. The trial court granted summary judgment, ruling the affidavits lacked factual support for the doctors' opinions. *Id*. Despite the very limited evidence of exposure, the 9th Circuit reversed, noting that

> Dr. Townsend stated that the changes he observed in plaintiff's tissue were "commonly seen in DES exposed offspring and rarely seen in non-DES exposed individuals." This was a statement of fact, and it is a reasonable inference from this fact that plaintiff's mother had taken DES during her pregnancy with plaintiff. As the party against whom summary judgment was sought, plaintiff was entitled to have such inferences drawn in her favor.

*Id.* at 1317.

A more recent ruling by a district court in Washington denied summary judgment to Lilly in yet another DES case. *Woolfolk v. Eli Lilly & Co.*, Case No. C03-3577RSM, (W.D.Wa. Mar. 15, 2005)(copy of opinion attached as **Exhibit O** hereto). As is increasingly common in DES cases, plaintiff's mother's physician was deceased and no records were available. Her mother recalled only that she had been prescribed "a hormone." *Id*. at 2.

-24-

Plaintiff presented her medical records which made note of her DES exposure and the testimony of an expert witness who had stated to a reasonable degree of medical probability that her physical abnormalities were consistent with exposure to DES. *Id*. at 3. Although the court stated that the DES references in the medical records would be considered hearsay unless a foundation for the diagnosis was established, it ruled that the expert's opinion was sufficient evidence of exposure to create a triable issue of fact on that point and denied summary judgment. *Id.*

The *Woolfolk* court's reasoning was adopted by a District of Columbia court in yet another recent ruling against Lilly in a DES case. In *Brooks v. Eli Lilly & Co.*, Case No.1:03-1796-EGS (D.C. July 28, 2005), Judge Sullivan denied Lilly's summary judgment motion without hearing, stating that:

> [F]or the reasons stated by Judge Martinez in *Woolfolk v. Eli Lilly and Co.*, this Court concludes that Plaintiff has presented sufficient evidence that there are triable issues of fact and thus defendants' motion must be DENIED.

*Id.*, ECF Docket Minute Entry dated 7/28/05.

### 3. Plaintiff's Proffered Testimony and Medical Records are Admissible Under Rules of Evidence and Various Hearsay Exceptions

The sheer volume and consistency of Plaintiff's exposure evidence far surpasses what was ruled to be sufficient in the cases of *Shields, Bulthuis, Woolfolk,* and *Brooks, supra.* The testimony of witnesses is consistent with and corroborated by others; medical records confirm and validate the witnesses' testimony. Indeed, Plaintiff's proof of his wife's exposure does not rely on one or a few bits of evidence; rather, it is a huge tapestry woven from the people, places and events that combined to alter her life and ultimately cause her

death. A comprehensive argument as to each statement or record that Lilly will attack as inadmissible is not possible (or even appropriate) within the confines of a summary judgment response. However, general lines of argument as to the applicability of hearsay exceptions and other evidentiary rules will convince the Court that sufficient admissible evidence exists to deny the Motion.

### a.    Federal Rules of Evidence 803(4),(6), 805, 807, and 1004

Defendant argues that Mrs. Davis' and Mrs. Manning's statements concerning Linda's diethylstilbestrol exposure, as well as Linda's medical records, are not admissible because they are ultimately based on hearsay statements made by Nurse Mary Gendron at Dr. Montag's office. Memorandum at 8-11. It is true that Nurse Gendron is deceased and Dr. Montag's medical records have been destroyed. However, several rules of evidence nonetheless provide for the admission of these statements.

### (1)    Statement of Nurse Gendron Concerning Mrs. Manning's Prescription of Stilbestrol

FRE 807–the residual hearsay exception– allows for the admission of statements not specifically covered by other exceptions to the hearsay rules. In order to gain the benefit of ths "catch-all" exception, the proponent must demonstrate that the statement has circumstantial guarantees of trustworthiness and is offered as a) evidence of a material fact, b) is more probative on the point for which it is offered that any other evidence that can be procured through reasonable efforts, and c) the general purposes of the rules and the interests

-26-

of justice will best be served by its admission. FRE 807[2].The proponent must also provide

advance notice to the opposing party of its intent to use the exception. *Id*.

Here, the statement of Nurse Gendron to Mrs. Manning that "it's on your chart, you did

take the Stilbestrol"is certainly offered as a material fact, i.e., that Linda Davis was exposed

to diethylstilbestrol. Because it is the ultimate fact upon which Mrs. Manning, Mrs. Davis

and Mrs. Davis' physicians ultimately relied on in seeking and providing medical care to

Mrs. Davis, it is clearly probative. And it is arguably more probative than any other evidence

that Plaintiff can procure, since he has been unable to locate any records of Mrs. Manning's

pregnancy despite more than reasonable efforts. The interests of justice will surely be served

by admission of the statement; to refuse it, this Court would ignore the fact that every other

element of Plaintiff's case is proven, and multiple levels of evidence point to the truth and

trustworthiness of the statement. Nurse Gendron had no reason to fabricate her statement--no

reason not to tell Mrs. Manning, a former patient, the truth about the contents of her medical

chart. In fact, her statement could almost be considered a statement against interest since, at

the time, many doctors feared liability for their having prescribed DES. The statement is

strongly corroborated by the testimony of Mrs. Greenberg that Dr. Montag prescribed

diethylstilbestrol to his patients, that Nurse Gendron handled the recordkeeping duties at his

medical practice, and that she handled calls from concerned patients asking for confirmation

---

[2]Prior to 1997, the residual hearsay exceptions were contained in Rules 803(24) and 804(b)(5). In 1997, the Rules were amended and the two residual exceptions were combined and transferred to new Rule 807. Decisions interpreting either Rule 803(24) or Rule 804(b)(5) are thus authority with respect to Rule 807 as well. *U.S. v. Hall*, 165 F.3d 1095, 1110 n.8 (7th Cir. 1999).

of their exposure to the drug. **Exhibit B**, Deposition of Joyce Greenberg at 13, 38. That

describes exactly what Mrs. Manning did when she heard about the negative effects of DES

on TV. **Exhibit A**, Deposition of Dorothy Manning at 38 ("I saw this on TV, and because

I had been prescribed this pill...I called the nurse from Dr. Montag's office.")

Nurse Gendron's statement is further supported by Mrs. Abodeely's testimony that Dr.

Montag prescribed diethylstilbestrol to her, and by the testimony of the other witnesses that

DES was commonly used in the Worcester area as a treatment to prevent miscarriage. All of

this consistent circumstantial evidence provides the necessary "guarantees of

trustworthiness" required for invocation of the rule. *See Brookover v. Mary Hitchcock*

*Memorial Hosp.*, 893 F.2d 411 (1st Cir. 1989); *see also U.S. v. Nivica*, 887 F.2d 1110 (1st Cir.

1989). In *Brookover*, statements of the injured plaintiff to his mother concerning the

circumstances of a fall he suffered were ruled admissible under hearsay exceptions, including

the residual exception. *Id.* at 419-20. The defendant hospital had argued that the statements

were not trustworthy, since both the injured plaintiff and his mother were interested parties

who had a motive to fabricate and embellish events. *Id.* at 420. The First Circuit explained

the application of the residual exception, stating

> The case law on this issue reflects that the determination of equivalent
> trustworthiness is completely fact driven....There is nothing in the Rule itself that
> requires explicit findings. No single factor is dispositive on the issue of whether
> evidence should be admitted under the residual exception. The district judge must
> evaluate all of the factors and make a determination.

*Id.* at 420.

The Court of Appeals examined the other evidence in the case, noting that "there was

-28-

extensive and credible evidence" that supported the trustworthiness of the mother's testimony, and the trial court had the benefit of seeing the mother testify. *Id.* The Court cited the case of *Furtado v. Bishop*, 604 F.2d 80 (1st Cir. 1979) in stressing the fact that "the weight to be given to the evidence was a matter for the jury to decide." *Brookover* at 420, *citing Furtado* 604 F.2d at 90. The situation is very similar here; Plaintiff has extensive, credible evidence that corroborates the nurse's statement, and the trial judge and the jury should have the ability to weigh the credibility of Mrs. Manning and the other witnesses.

In addition to the residual exception, Nurse Gendron's statement is also admissible under FRE 1004. That rule allows the proponent of a destroyed or unobtainable document to submit other evidence of the contents of the document if certain conditions are met. FRE 1004(1), (2)[3]. Here, Plaintiff's mother's medical chart relating to her obstetrical treatment with Dr. Montag was destroyed around the time of Dr. Montag's death, if not earlier. **Exhibit B,** Deposition of Joyce Greenberg at 25-26. No copies of the records appear to exist -- Plaintiff has made a diligent search for copies of the records by contacting all of Mrs. Manning's subsequent medical providers, but has been told that no copies were ever transferred to any of them. Clearly, the destruction of the records involved no wrongdoing

---

[3]The text of the relevant portions of FRE 1004 are:
"**Rule 1004. Admissibility of Other Evidence of Contents**
   The original is not required, and other evidence of the contents of a writing, recording, or photograph is admissible–
   **(1) Originals Lost or Destroyed.** All originals are lost or hav been destroyed, unless the proponent lost or destroyed them in bad faith; or
   **(2) Original Not Obtainable.** No original can be obtained by any available judicial process or procedure; or..."

on Mrs. Manning's part, and thus, Plaintiff is entitled to submit secondary evidence of the contents of the record. *See U.S. v. Balzano*, 687 F.2d 6 (1st Cir.1982); *U.S. v. Carroll,* 860 F.2d 500 (1st Cir.1988); *Commonwealth v. Ocasio*, 746 N.E.2d 469 (Mass. 2001).

Plaintiff must first demonstrate that the original once existed. *Ocasio, supra*, at 472 (citing Proposed Mass.R.Evid.1004). Joyce Greenberg has testified generally as to the recordkeeping procedures at her father's medical office and has stated that Nurse Gendron was the one responsible for keeping medical records. **Exhibit B**, Deposition of Joyce Greenberg at 13. She has also confirmed that Mrs. Manning was a patient of Dr. Montag's practice, and that his delivery of Linda Davis is documented in the only remaining record from the practice – a book listing the names and dates of birth of all babies Dr. Montag delivered. *Id*. at 33. Linda Davis' birth certificate, **Composite Exhibit F**, also indicates that Dr. Montag delivered her. Mrs. Manning has testified that Nurse Gendron consulted the medical chart when Mrs. Manning called to check on the medication she had taken during her pregnancy. **Exhibit A**, Deposition of Dorothy Manning at 39-40. Nurse Gendron's subsequent statement to Mrs. Manning that the chart showed that Mrs. Manning had taken stilbestrol is the best evidence available as to the contents of Mrs. Manning's medical record and is thus admissible under FRE 1004. *Balzano, Carroll, Ocasio, supra*.

### (2)   Mrs. Manning's Statements Concerning Her Ingestion of DES

Having established the admissibility of Nurse Gendron's statement to Mrs. Manning, it is then clear that Mrs. Manning's statements to her daughter and to her daughters' doctors are also admissible under FRE 803(4) relating to statements for purposes of medical

-30-

diagnosis or treatment and describing medical history or symptoms. A statement offered under that rule need not refer to the declarant's own medical condition. *See* Saltzburg, et al, FEDERAL RULES OF EVIDENCE MANUAL, 7th ed.(1998) at 1665. If the declarant relays information about another person for purposes of treating or diagnosing that person, then generally speaking the same guarantees of trustworthiness exist as when the declarant is seeking treatment for himself. *See, e.g., Lovejoy v. United States*, 92 F.3d 628, 632 (8th Cir. 1996)(statements made by a child's mother to a nurse admissible since they were given to aid in diagnosis and treatment of the daughter). Moreover, statements made by family members and even bystanders, made for purposes of treating an injured person and pertinent to that treatment, have often been admitted under Rule 803(4). *See, e.g., Cook v. Hoppin,* 783 F.2d 684 (7th Cir. 1986); Salzburg, *supra*. Here, Mrs. Manning statement, in particular, to Dr. Halpin that she had taken diethylstilbestrol while pregnant with Linda was an important piece of medical history that was necessary for Linda's future medical treatment and diagnosis. It was also important for Mrs. Manning's own future medical treatment since DES has been linked with an increased rate of breast cancer in mothers who took it. *See*, www.cdc.gov/des.

### (3)   Mrs. Davis' Recorded Statements to Her Treating Doctors

Again, since Nurse Gendron's statement to Mrs. Manning is admissible, Linda Davis' statements to her doctors relating to her exposure to diethylstilbestrol, as well as the entries in her medical records are in turn admissible. Defendant argues that these records are "double hearsay." Memorandum at 10. However, the rules of evidence provide that as long as the applicability of a hearsay exception or other basis for admissibility of each portion of a

statement has been met, it is admissible. FRE 805. First of all, Mrs. Davis' medical records are all clearly admissible. *See Woolfolk v. Eli Lilly, supra*, **Exhibit O** at 3; Rule 803(6)[4]. The question is whether the DES references within them are also admissible.

Mrs. Davis testified that she first learned of her DES exposure when her mother took her to first gynecologic examination, done by Dr. Halpin, sometime in the mid 1970s. At that time, "Dr. Halpin and my mother sat me down and talked to me about it." **Exhibit H**, Deposition of Linda Davis at 17-18. He explained to Linda what "Stilbestrol" was and why it was used in her mother's case, i.e., to help hold the pregnancy. *Id.* He advised her "to make sure whatever doctor I went to that I let them know I was a DES daughter...So I did. Whenever I went to a doctor, I said, 'I'm DES exposed'." *Id*. Thereafter, Mrs. Davis told her doctors of her exposure, as is evidenced multiple times in her medical records as set forth above. Medical records dated 3/2/81, 11/9/89, 2/27/91, and 8/26/98 all note her history of DES exposure, years before her diagnosis of cancer. **Composite Exhibit I**, Affidavit of Patricia M. Stanford, Esquire with Attached Medical Records.

All of these statements are admissible under FRE 803(4) relating to statements for

_____

[4]Plaintiff does not anticipate that Defendant would object to the admission of his wife's medical records. However, if they do, such an objection fails under Rule 803(6) since they are clearly records of Mrs. Davis' medical conditions, opinions and diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, and were kept in the course of the doctors' medical practices which had the regular practice of keeping such records. If Defendant will not stipulate to their admission, Plaintiff will bring in the appropriate records custodians. The medical records exception of 803(6) when combined with the statements for purposes of medical treatment exception of 803(4) makes these records clearly admissible in their entirety. *See, e.g., Petrocelli v. Gallison*, 679 F.2d 286, 289-90 (1st Cir.1982).

purposes of medical diagnosis or treatment and describing medical history or symptoms.[5]

*See, e.g., U.S. v. Iron Shell,* 633 F.2d 77 (8th Cir.1980), *cert. den.*, 450 U.S. 1001 (1981)*;*

*Lovejoy v. U.S.*, 92 F.3d 628 (8th Cir.1996). *Iron Shell* is the leading case establishing a two-

pronged approach to admissibility of statements under Rule 803(4). First, the declarant's

motive in making the statement must be consistent with the purpose of promoting treatment.

Second, the content of the statement must be such as is reasonably relied upon by health care

providers in treatment or diagnosis. *Id*. at 84.

Here, it is quite obvious that Mrs. Davis' statements to her providers that she was DES

exposed were descriptive of her medical history as related to her by Dr. Halpin and her

mother. Linda had been specifically directed by Dr. Halpin to let her doctors know of her

exposure as that information would be important for them to know in their examinations and

treatment of her. Even now, the CDC advises DES-exposed women to advise their doctors

of their exposure. *See, e.g.*, www.cdc.gov/des. Mrs. Davis' statements as to her exposure

were also of the type relied upon by her doctors in order to provide appropriate treatment.

DES daughters are advised to have regular gynecologic exams, special vaginal Pap smears

and periodic colposcopies to screen for tissue changes and clear cell cancer, the exact injuries

that Mrs. Davis ultimately suffered. *Id.*  Indeed, her DES exposure was a red flag to Dr.

Zweizig, her oncologist, in diagnosing the type and cause of the cancer Mrs. Davis had.

---

[5]The full text of Rule 803(4) is as follows:
**Statements for Purposes of Medical Diagnosis or Treatment.** Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensation, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

**Composite Exhibit J**, Deposition and Expert Report of Susan Zweizig, MD at 20-21.

Moreover, Linda Davis has testified that during her discussions with Dr. Pohley (her early gynecologist) Dr. Young (her primary care provider), Dr. Aversa (her obstetrician) and Dr. Zweizig (her oncologist) about her DES exposure, they agreed, based upon their physical examination of her, that she was indeed exposed. **Exhibit H**, Deposition of Linda Davis at 26-27, 30, 32.

Again, the volume of consistent and corroborative testimony and opinion compels the conclusion that Mrs. Davis' statements to her doctors were clearly trustworthy and given solely with the motive to aid in her own treatment and diagnosis, particularly those statements made long prior to her cancer diagnosis.[6] These types of statements by the patient, together with corroborating statements by the doctors, were sufficient to defeat summary judgment in the *Shields, Bulthuis, Woolfolk* and *Brooks* cases, *supra.* The corroboration of the DES exposure made by treating doctors upon their physical examinations of the plaintiffs was particularly stressed by the Court in *Bulthuis* and *Shields.* Here, however, Plaintiff's evidence far surpasses that presented in those cases.

    **b.**    **Evidence of Dr. Montag's Custom and Routine Business Practice - FRE 406**

In addition to more direct evidence of Linda Davis' exposure to diethylstilbestrol, Plaintiff has presented evidence of Dr. Montag's custom and practice of prescribing the drug.

---

[6]As even Dr. Zweizig testified, "You have Linda saying from a very early age that she was a DES daughter. So this was not an exposure that was dreamed up after her diagnosis of clear-cell carcinoma of the vagina." **Composite Exhibit J**, Deposition of Susan Zweizig, MD at 20.

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. FRE 406. Plaintiff has presented evidence from multiple sources that it was Dr. Montag's custom and habit in his medical practice to prescribe the drug, diethylstilbestrol, as a treatment for miscarriage prevention. Based on its specificity and consistency, all of these statements should be admissible under Rule 406. *Babcock v. General Motors Corp.*, 1st Cir. Case No. 01-2270, Opinion 8/12/02 (admitting evidence of decedent's habit of using seat belt to prove use at time of accident, stating "it is well established that habit evidence may be used to prove a person's conduct on a particular occasion"; *citing U.S. v. Newman*, 982 F.2d 665, 668 (1st Cir. 1992)). *See also Meyer v. U.S.*, 638 F.2d 155, 157 (10th Cir. 1980)(habit, custom and routine of dentist to inform patient of procedure admissible under Rule 406, especially when supported by two dental assistants).

As detailed above, Mrs. Manning, Joyce Greenberg and Daphne Abodeely have all testified that Dr. Montag prescribed diethylstilbestrol to patients with troubled pregnancies or a history of miscarriage. As patients of his and the mothers of DES-exposed daughters, the testimony of Mrs. Manning and Mrs. Abodeely is particularly trustworthy. Mrs. Abodeely specifically recalls Dr. Montag using the term diethylstilbestrol when he explained to her what he was prescribing and she saw the term in her medical records **Exhibit C**, Affidavit of Daphne Abodeely.

Joyce Greenberg's testimony comes from the vantage point of living and working with

-35-

her father over the course of many years. Not only did she know that he prescribed the drug around the time Mrs. Manning took it, but she was involved in conversations with her father about the many calls his office received from patients who were seeking information about their use of the drug. **Exhibit B**, Deposition of Joyce Greenberg at 37-38. She also testified how Dr. Montag regularly received visits from drug company representatives, and that he always kept and read the product literature they left for him. *Id* at 21-22.

In addition, Plaintiff has presented the testimony of a Worcester pharmacist, Joseph Rossetti, RPh and a Worcester obstetrician, Russell Johnson, MD, that diethylstilbestrol was commonly used by OB/GYNs in the area as a miscarriage preventative. **Composite Exhibit D**, Deposition of Joseph Rossetti, RPh, Affidavit and Sworn Supplemental Statement; and **Exhibit E**, Affidavit of Russell E. Johnson, MD.  The testimony of Harold Sparr, RPh also explains that "diethylstilbestrol was the only popular oral hormone medication given in the 1950s and 60s to pregnant women. It was the drug of choice and the standard treatment for pregnant women and the only popular oral medication used for that purpose. **Exhibit P**, Statement of Harold Sparr, RPh at ¶10. He has also testified regarding Lilly's publication, *De Re Medica*, which was sent to all physicians in the country and which advocated its diethylstilbestrol as the best medication for avoiding miscarriage. *Id*.

Plaintiff's evidence of Dr. Montag's custom and practice in prescribing diethylstilbestrol to patients with problematic pregnancies or a history of miscarriage is admissible under Rule 406. It is up to the jury to decide the weight and credibility to be attached to it. *Newman, supra.*

### C.  MASSACHUSETTS RECOGNIZES THE "HEEDING PRESUMPTION" THAT SERVES AS THE CAUSAL LINK IN A FAILURE TO WARN CASE

Plaintiff is entitled to the presumption that the prescribing physician, Dr. Paul Montag, would have read and heeded an adequate warning as to the risks of DES if one had been provided by the Defendant. *Garside v. Osco Drug*, 976 F.2d 77 (1st Cir 1992); *Knowlton v. Deseret Medical, Inc.,* 930 F.2d 116 (1st Cir. 1991); *Harlow v. Chin*, 545 N.E.2d 602 (1989). The well-established "heeding" presumption arises once a plaintiff has demonstrated that the defendant manufacturer knew or should have known of the risks of the product but failed to adequately warn the medical profession about the potential for harm. RESTATEMENT (SECOND) OF TORTS, §402A, Comment j (1965); *Osco Drug*, 976 F.2d 77 at 81.

The presumption serves as the causal link between the failure to warn and the ingestion of the drug that caused injury. *Knowlton,* 930 F.2d at 123*, citing Seley v. G. D. Searle & Co.*, 423 N.E.2d 831, 837 (1981). Thus, once Plaintiff comes forward with evidence that Lilly failed to adequately warn of the risks of DES, it is presumed that Dr. Montag would not have prescribed the DES that caused her injury.[7] Unless the defendant can produce irrefutable evidence rebutting the presumption, plaintiff has carried the initial causation burden. *Knowlton, id.*

---

[7]Defendant contends that the heeding presumption does not apply until a plaintiff proves that the particular defendant failed to warn the specified physician. Memorandum at 14. Such an argument is absolutely absurd; no drug company provides individualized warnings to specific doctors. Instead; their warnings are placed in the Physicians' Desk Reference, a book to which doctors generally look for information about drugs. They also send out their sales staff to call on doctors and provide them with written literature, just as Mr. Breen and Mr. Goulet called on Dr. Montag's practice. **Composite Exhibit K**, Eli Lilly and Company's Responses to Plaintiff's First Set of Interrogatories at No. 7.

Massachusetts first adopted the heeding presumption in *Harlow v. Chin, supra*, but the mechanics of its application were more fully explained in *Knowlton*. The plaintiff in *Knowlton* sued Deseret Medical, the manufacturer of a catheter and needle that malfunctioned during his open heart surgery. 930 F.2d. at 118. Plaintiff claimed that Deseret should have warned physicians of the risk of injury related to a particular method of use of the product called retrograde threading and that the failure to do so resulted in plaintiff's injuries. *Id.* Plaintiff presented evidence that Deseret should have known of the risks inherent in retrograde threading and that an explicit warning of those risks should have been given. Deseret acknowledged that it took no steps to warn surgeons that retrograde threading should not be done. *Id.* at 119. The jury found for plaintiff, and defendant moved for judgment n.o.v. on the basis that, even if such a specific warning had been given, it would not have mattered since the plaintiff did not prove that his physician would have followed it. *Id.* at 123. The First Circuit affirmed the trial court's denial of the defendant's motions, stating:

> This, however, is a misdirected line of fire. The presumption is generally accepted in most jurisdictions, including Massachusetts, that if a warning is given, it will be followed. It is difficult to accept that a proper warning would have been deliberately ignored. To do so would amount to malpractice[.]

*Id.*

The court then went on to explain the defendant's requirement for overcoming the heeding presumption:

> [I]t was incumbent on the defendant, not plaintiff, to prove that [plaintiff's physician] would not have followed an adequate warning about the danger inherent in retrograde threading. Deseret failed to do so to the extent necessary to entitle it to a judgment n.o.v.

*Id.* (citations omitted; emphasis added).

This principle of shifting the burden back to the defendant in a failure to warn case was reiterated in *Garside v. Osco Drug, Inc.*, 976 F.2d 77 (1st Cir 1992). *Osco Drug* involved injuries to a child resulting from the reaction of two drugs she was prescribed for an ear infection. The combination of phenobarbital and amoxicillin resulted in the child's suffering toxic epidermal necrolysis (TENS), a condition which caused severe burns to the skin, blindness and hearing loss. McKesson Corporation, the manufacturer of the phenobarbital she ingested, moved for summary judgment on the basis that the prescribing physician would not have warned the patient's mother of the interaction of the drugs, thus constituting an intervening cause of her injuries. *Id.* at 79. In support of its motion, McKesson submitted an affidavit of the prescribing physician who stated that he did not discuss with his patients any causative connection between the two drugs and TENS. *Id*. Plaintiffs responded with an affidavit from their causation expert who stated that McKesson should have warned physicians of the risks of acquiring TENS from the combined ingestion of the two drugs. *Id.* at 82.

The trial court granted summary judgment on the basis that the prescribing physician's admission that he would not warn his patients of the possible connection between the two drugs and TENS was an intervening-superseding cause of the plaintiff's injuries. *Id*. at 79-80. The First Circuit reversed, holding that the plaintiffs were entitled to a rebuttable presumption that the doctor would have heeded an adequate warning, since they had shown that the manufacturer had failed to warn. The court went on to discuss the level of evidence that a defendant must produce in order to rebut the heeding presumption, setting out the

requirement that "the [prescribing] physician's testimony show unequivocally that s/he knew at the relevant time all the information which would have been included in a proper warning." *Id.* at 82.  The court held that the treating physician's affidavit relied upon by McKesson did not constitute the unequivocal evidence necessary to rebut the heeding presumption. *Id.* at 82-83.

Here, Plaintiff's claims center on Lilly's failure to give adequate warnings to the medical profession of the risks of prescribing DES to pregnant women. For purposes of the summary judgment motion only, Plaintiff is entitled to have this Court assume the correctness of his assertions that Lilly's warnings, if any, were inadequate. *Osco Drug, supra*, at 82, n. 6. Nonetheless, Plaintiff has gone further by presenting substantial, direct evidence of the inadequacy of Lilly's product literature.

The testimony of Brian Strom, M.D., **Exhibit L**, Supplemental Statement of Brian Strom, MD MPH, establishes that Lilly knew or should have known that DES was capable of modifying the sexual development of test animals and that it posed a risk of serious injury to the developing fetus of a human mother ingesting DES. It further demonstrates that the medical literature that existed for years prior to Linda Davis' exposure to DES could have and should have alerted Lilly to the dangers of promoting DES to pregnant women without human testing, and to the need to properly label and warn of potential risks to the fetus.

Indeed, more than a decade before Linda Davis was exposed, scores of medical studies had begun to appear in the medical literature questioning the safety and utility of high dose DES therapy in pregnancy. As early as *1953*, a double-blind, controlled study of over 1500

pregnant women determined that DES was useless in preventing miscarriage, and in fact increased the rate of pregnancy loss.[8]  And prior to the time of Linda's exposure, scientists were reporting gross limb defects in infants born to mothers taking thalidomide, graphically demonstrating that drugs taken by the mother could have direct transplacental effects on the fetus. In fact, a 1959 report published by doctors from Children's Hospital in Philadelphia questioned the safety of DES and published photographs of female babies with masculinized genitalia who had been born to mothers given DES during pregnancy.[9]

Any conscientious drug manufacturer would have pulled DES off the market, yet the Defendant continued to sell its DES products for use in pregnancy until the drug was banned by the FDA in late 1971. As Plaintiff's epidemiologist and causation expert, Dr. Paul Stolley has testified: "The fact that [DES] was marketed and labeled and advocated to prevent spontaneous abortion with insufficient evidence that it really could do that, and it was also a known potent carcinogen, strikes me as reckless behavior." **Exhibit Q**, Deposition of Paul Stolley, MD at 23.

Joseph Rossetti, RPh, is a pharmacist who worked at, and now owns, Boulevard Pharmacy in Worcester, the pharmacy where Mrs. Manning's prescriptions for DES were filled. He has testified that Boulevard stocked and dispensed only the Lilly brand of DES in

---

[8]W. J. Dieckmann, et al., *Does the Administration of Diethylstilbestrol During Pregnancy Have Therapeutic Value?*, 66:5 Am. J. Obstet. Gynecol., 1062-1081 (November 1953).

[9]A. Bongiovanni, A. DiGeorge, M. Grumback, *Masculinization of the female infant associated with estrogenic therapy alone during gestation*, 19 J. OF CLIN. END. AND MET. 1004 (1959).

the 1950s and 1960s. He has further stated that it was the custom and practice of obstetricians in the Worcester area to prescribe DES as a miscarriage preventative. His own wife took the drug at the direction of her physician. Moreover, Mr. Rossetti has testified that he has reviewed the Eli Lilly entry regarding diethylstilbestrol in the Physicians' Desk Reference from 1960 ("PDR"), and it contains no warnings that would have alerted him to any possible risk to a pregnant woman or her fetus. He stated that, had he been informed by Eli Lilly through warnings in the PDR, package insert or other materials, that diethylstilbestrol carried a risk of serious injury to the offspring of the pregnant women who took it, he would have, consistent with the custom and practice of the late 1950s and early1960s, advised the patient not to assume that risk. **Composite Exhibit D**, Supplemental Statement of Joseph Rossetti, RPh at ¶ 8.

As mentioned previously, Joyce Greenberg, Dr. Montag's daughter, has testified that her father was an extremely conscientious and dedicated physician. In her deposition, she stated that her father "read constantly" and explained how he regularly received visits from drug company detailmen and always read the product literature they left with him. **Exhibit B**, Deposition of Joyce Greenberg at 21, 24. At least two of those detailmen were John Breen and Maurice Goulet, the Lilly representatives who called on Dr. Montag's practice. **Composite Exhibit K**, Eli Lilly and Company's Responses to Plaintiff's First Set of Interrogatories. Mrs. Greenberg further testified that her father would never have prescribed a medication to his patients if he had any knowledge that the drug could harm the patient or her fetus. The clear inference is that, if Lilly had included a warning in its PDR listing or

product literature for diethylstilbestrol, Dr. Montag would never have prescribed the drug.

With the testimony of Dr. Strom, Mrs. Greenberg and Mr. Rossetti, Plaintiff has not only met, but exceeded, the standards set forth in *Osco Drug* and *Knowlton*, thus entitling him to the presumption that Dr. Montag (or any reasonable physician in his circumstances) would have heeded an adequate warning, if one had only been provided. That presumption in turn satisfies the causal connection between the Defendant's action (or inaction) and Linda Davis' injuries.

### 1.    Defendant Has Submitted Absolutely No Evidence to Rebut the Heeding Presumption

Once a plaintiff gains the benefit of the heeding presumption, the burden shifts to the defendant to rebut it. *Osco Drug*, 976 F.2d 77 at 81. Here, the Defendant has not made even a token effort to rebut the presumption: it has produced no testimony, no documents, not even any argument that Dr. Montag would have prescribed DES in the presence of a valid warning.

On the other hand, Plaintiff has produced the testimony of Dr. Montag's daughter as described above. Moreover, as the Defendant well knows, even a living, breathing prescribing physician's pre-trial statement that he would have ignored an adequate warning is insufficient to allow a defendant manufacturer to escape liability. *Osco Drug; Knowlton; supra.* While some courts have held that a physician's testimony may sometimes shield a manufacturer, those courts have required that such testimony show *unequivocally* that the doctor knew at the relevant time all the information which would have been included in a proper warning. *Osco Drug*, 976 F.2d at 82 (citations omitted). Even then, the court in *Osco*

-43-

*Drug* expressed its "grave reservations" about whether the Massachusetts Supreme Judicial Court would actually follow such decisions. As the court stated:

> In light of both the presumption afforded a plaintiff under Massachusetts law that a proper warning would be heeded...and the general rule that questions of intervening causation are better decided by a jury...the Massachusetts Supreme Judicial Court would likely be reluctant to allow a physician's pre-trial testimony about what s/he would have done had s/he been warned to insulate a defendant manufacturer from liability. Such reluctance would find support in a line of cases holding that a physician's statement about what s/he would have done in the face of an adequate warning raises a credibility issue which must be decided by a jury.

*Osco*. at 83, n.9 (internal and additional citations omitted).

Even if it could be shown that Dr. Montag was himself somehow negligent in his prescription of DES to Linda Davis' mother, that does not relieve Lilly of liability. *See Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 660 (1st Cir. 1981) (citing *McCue v. Norwich Pharmacal Co.,* 453 F.2d 1033, 1035 (1st Cir. 1972)("[a] physician's carelessness, even if it takes an unanticipated form, should not relieve a drug manufacturer of liability if the manufacturer's failure to warn adequately may have contributed to that carelessness").

Defendant has lost this heeding presumption argument before, at least once.[10] *Hibbs v. Abbott Labs, et al.,* 814 P.2d 1186 (Wash. Ct. App. 1991), is the only reported decision that addresses the heeding presumption in a DES setting. In *Hibbs*, the prescribing physican, Dr. Rutherford, was alive and testified for the Defendant. Interestingly, Lilly counsel obtained

_____

[10]Lilly made the identical arguments in a summary judgment motion it filed in this court in the case of *Casale v. Eli Lilly & Co.*, Case No. 03-11833-DPW. Although Judge Woodlock did not conduct a full hearing on the motion, he asked for the parties' respective positions at a status conference. He was visibly skeptical of the motion and stated on the record that he was inclined to deny it. *See* Case No. 03-11833-DPW, Minute Docket Entry of 3/23/04.

-44-

testimony from him that it could only hope to have extracted from Dr. Montag:

> Q: [W]hen you would decide to prescribe stilbestrol to a [pregnant] woman, was your decision to order Stilbestrol based upon the work of Smith and Smith, the work of Priscilla White, your residency in Boston, and your experience with the pharmaceutical (sic) here in Washington?
> A: Yes.
> Q: Was it also based on your ongoing review of the medical literature as Editor of the [Western Journal of Surgery, Obstetrics and Gynecology]?
> A: Yes.
> Q: Was it also based upon your contacts and experiences with obstetricians in the area?
> A: Yes.
> Q: Was it based in any way at all upon the promotional literature of any pharmaceutical company?
> A: No. These were based on my observations personally, plus continuing reports in reputable medical journals..."

*Id.* at 1187, n. 3.

The *Hibbs* court rejected the defendants' argument that Dr. Rutherford relied only on his own

knowledge and experience in prescribing stilbestrol, stating that:

> Dr. Rutherford's reliance on his own knowledge of DES in deciding to prescribe the drug to Bernadine Raymond has no bearing on whether he would have heeded warnings, had any been given, that the drug posed serious risks to the unborn children of pregnant women.

*Id.* at 1189 (emphasis supplied).

The same result obtains under Massachusetts law. Since Plaintiff has already

demonstrated his right to the benefit of the heeding presumption, it is incumbent upon the

Defendant, not Plaintiff, to prove that Dr. Montag would not have followed an adequate

warning about the dangers of DES. *See Knowlton, supra,* 930 F.2d at 123. Yet Lilly has

produced absolutely no evidence that Dr. Montag would have ignored adequate warnings

about the risks that DES could pose to pregnant women and their babies. The fact of the

matter is that the converse is true, as evidenced by the testimony of Mrs. Greenberg.

-45-

### 2. The Heeding Presumption Is Not Restricted to The Brand Name Drug Context

Lilly attempts to avoid the effect of the heeding presumption by claiming it does not apply in the case of a generic drug. Memorandum at 15. However, it does not, and cannot, cite any case law for that position. The heeding presumption has never been restricted to the context of brand name drugs. Besides, DES was not a generic drug as that term has come to be known today. In the 1960 Physicians' Desk Reference (PDR) and for many years prior to and after that, Lilly had the most conspicuous entry for diethylstilbestrol. Theirs was *the* expert source of information and warnings on DES in the one resource that physicians consulted on a regular basis. In addition, as explained in the affidavit of Harold B. Sparr, RPh, at **Exhibit P**, Lilly was the leading drug manufacturer in America during the 1950s and 60s and was considered the specialist in DES. It was the only drug company to require all of its sales force to be licensed pharmacists which allowed them greater access to pharmacists and pharmacy stocking practices than any other company. *Id.*

Lilly was the dominant voice in the promotion of DES from the outset. At the time of FDA approval of the drug in the 1940s, the manufacturers, led by Lilly, agreed to *uniform labeling* and packaging. *See* **Exhibit R**, Letter from D.C. Hines, M.D., Medical Director of Eli Lilly and Company, to Dr. J.A. Morrell, E.R. Squibb & Sons, dated May 13, 1941(emphasis added).

### D. THE AFFIDAVITS OF ASHLEY WEAVER AND BENJAMIN SACHS MUST BE STRICKEN

Defendant seeks to rely on the affidavits of Ashley Weaver and Benjamin Sachs to

-46-

inject *some possibility* that Linda Davis was exposed to a drug other than diethylstilbestrol, i.e., some other "DES-type" drug. Before even delving into the inadmissibility of the documents these affidavits purport to attach, it is important to note that neither of the affiants has a hint of personal knowledge of the matters to which they claim to attest, and thus, their affidavits must both be stricken.[11] The law is well-established that "[d]ocuments supporting or opposing summary judgment must be properly authenticated". *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir.2000) (citing Fed.R.Civ.P. Rule 56(c), (e)); *Robinson v. Bodoff,* 355 F.Supp.2d 578 (D.Mass.2005). The failure to authenticate a document properly precludes its consideration on a motion for summary judgment. *Carmona* at 131; *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 16 (1st Cir.1986). Unless an exhibit is self-authenticating, the usual practice is to authenticate it through the affidavit of a witness who would be qualified to authenticate the exhibit at trial. *Robinson* at 582.

Ms. Weaver is an associate attorney in the office of Foley & Hoag, the Defendant's counsel. She was not yet alive at the time of any of the relevant events in this case. Likewise, Dr. Sachs was a mere 9 years old and living in England during the time Mrs. Manning ingested diethylstilbestrol. It is obvious that neither of these affiants could possibly have personal knowledge of the events at issue in this case, to-wit: the prescription of

---

[11]While no separate motion to strike the affidavits was filed, the form of the objection to a defective affidavit is not critical. *Perez v. Volvo Car Corp.*, 247 F.3d 303, 314 (1st Cir. 2001)("whether the dissatisfied party fulfills these requirements by means of a motion to strike or in some substantially equivalent way (say, by an objection or, as here, in a legal memorandum urging the granting of summary judgment notwithstanding the affidavit) is of little moment").

diethylstilbestrol in **1960-61** by a Worcester physician as a miscarriage preventative for Mrs. Manning. Moreover, they clearly have no personal knowledge as to pharmacy practices during that time or the ins and outs of medical research and literature regarding DES in the 1970s .[12] This lack of competence and personal knowledge precludes the Court's consideration of the affidavits and any attachments thereto. *See* Rule 56, Fed.R.Civ.Pro.; *Carmona v. Toledo,* 215 F.3d 124, 131 (1ˢᵗ Cir. 2000); *Schubert v. Nissan Motors,* 148 F3d 125, 130 (1ˢᵗ Cir 1998).

Ms. Weaver's "affidavit" purports to authenticate numerous documents by simply stating that they are "true copies". Some of the documents are self-authenticating or admissible as pleadings or admissions in the case. However, Exhibits 7-13 are dozens of pages of largely illegible documents purported to be pages from the 1960 PDR, a 1976 brochure on DES for physicians, diethylstilbestrol product listings circa 1960-61, and copies of various federal statutes and regulations. While Ms. Weaver dutifully recites that her affidavit is "made on personal knowledge", it is clear from its face that it is not. The attachments cannot possibly be within the personal knowledge of an attorney who was not even alive at the time they were created. A writing is not authenticated simply by attaching it to an affidavit; rather, all papers referred to in an affidavit must be separately sworn to or certified. *See* Fed. R. Civ. P. 56(e)*; Carmona, supra; Robinson, supra. See also United States v. Dibble,* 429 F.2d 598, 602 (8th Cir. 1970).

---

[12]Moreover, how any author or report defined "diethylstilbestrol" in 1971-1976 is absolutely irrelevant to the question of what drug was prescribed to Plaintiff 10-15 years earlier.

Moroever, the affiant for any exhibit to an affidavit must be a witness with personal knowledge of its content and through whom the movant could seek its admission into evidence. *Id*. Because Ms. Weaver's affidavit demonstrates on its face that she lacks the requisite personal knowledge regarding the attachments, the affidavit insofar as it attempts to authenticate Exhibits 7-13 must be stricken and disregarded by the Court. *Carmona, supra, Robinson, supra; Dibble, supra.* Since the documents are relied upon as "statements of fact" and in argument in Defendant's Memorandum, those portions citing them must likewise be stricken.

Even if they could be authenticated, excerpts of the pharmacy price lists attached to Ms. Weaver's affidavit are also inadmissible due to lack of relevance or probative value. The most that the documents can possibly do is indicate that approximately 100 companies *may* have manufactured, distributed, tableted, repackaged, offered for sale, and/or sold DES *somewhere* in the United States. These documents are hearsay and do not in any way indicate or prove that any of these companies' products were sold, or even available for sale, in the Worcester area, or at Boulevard Pharmacy in Worcester, where Mrs. Manning obtained the drug. They are virtually illegible, but even if readable, an expert witness or other knowledgeable witness would have to explain them to a jury and be prepared to testify whether any of the companies' products were indeed carried in Boulevard Pharmacy.[13]  To the contrary, however, the only *admissible* evidence supplied in this case is that Eli Lilly's

---

[13]Of course, the expert deadline is long past and Lilly has disclosed no witness with this type of knowledge or expertise.

brand of diethylstilbestrol was ingested by Mrs. Manning. *See* **Composite Exhibit D**, Deposition of Joseph Rossetti, RPh. Mr. Rossetti has stated that Lilly's was the *only* brand of DES he carried. It should also be noted that formal motions to strike have been made as to these "pharmacy price list exhibits" multiple times in other DES cases, some of which are still under consideration by various courts.[14]

Dr. Sachs' affidavit must be stricken for largely the same reasons as those applicable to Ms. Weaver's. While he is a physician and arguably is more likely to have personal knowledge of the statements made and documents referenced in his affidavit, that is not the case here. Unlike Ms. Weaver's, his affidavit does not even pretend to be based upon his personal knowledge and merely says that he "states as follows."

In the numbered paragraphs of his affidavit, he takes incredible literary license and purports to know all of the people involved in various DES research papers and projects, as well as their states of mind. He claims to know the reasoning and facts behind the use of particular terms in such papers and reports. Yet the curriculum vitae attached to his statement indicates absolutely no involvement in research, clinical experience or writing of any papers related specifically to DES. In addition, any expertise he may have related to these things would require that he had been listed and disclosed by the Defendant in accordance with this Court's scheduling order which he has not.

---

[14] *See, e.g., Baughn v. Eli Lilly and Company*, Case No. 03-2626-KHV, USDC for District of Kansas, Docs.#44, 61; *Bohlin v. Eli Lilly and Company*, Case No. 03-CV-11577-MEL, USDC for District of Massachusetts, Doc. #39; *Bortell v. Eli Lilly and Company, et al;* Case No. 04-CV-00954-ESH, Doc.#54.

Because Dr. Sachs statements are uncorroborated, not properly offered as expert testimony and refer to unauthenticated and unattached documents, his affidavit clearly falls far short of the requirements of Rule 56(e). As such, the affidavit and attached documents, as well as the "statements of fact" in the Memorandum which are based upon his affidavit must all be stricken. When an affidavit is based on statements of others that are not independently verified by the affiant, it is inadmissible and must be stricken. *Carmona, supra; Schubert, supra.* Here, it is clear on the face of Dr. Sachs' affidavit that he has no personal knowledge of his statements, nor could he possibly have such knowledge as an English schoolchild during the relevant events of this case. Instead, Defendant is attempting to use his statements to construct a "possibility" that Mrs. Manning was prescribed some unknown medication other than diethylstilbestrol. However, they are basing that attempt on documents that (even if authenticated and relevant) were prepared 10-15 years after Mrs. Manning's ingestion of the drug. The only evidence in the case is that what Dr. Montag prescribed, what Mrs. Manning ingested and what Linda Davis was exposed to, was diethylstilbestrol–and diethylstilbestrol manufactured by Lilly at that.

### E. PLAINTIFF'S BREACH OF WARRANTY AND NEGLIGENT MISREPRESENTATION CLAIMS ALLOWED

As to these claims set out in Counts III and IV of Plaintiff's Amended Complaint, Defendant's summary judgment motion is more in the nature of a Rule 12(b)(6) motion since it has done nothing to meet its initial burden of demonstrating the lack of genuine issues of material fact. At this stage of the proceedings, Plaintiff is entitled to have the Court accept

all factual allegations in his Amended Complaint as true and draw all reasonable inferences

in his favor. *Garita Hotel Ltd. v. Ponce Fed. Bank*, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992);

*Johnson v. Brown & Williamson*, 122 F. Supp. 2d 194, 198 (D. Mass. 2000). Thus, Plaintiff

is entitled at a minimum to have the court consider the following allegations as true:

- DES was an untested, dangerous and defective drug.
- Lilly failed to disclose to the FDA and the medical profession important studies concerning DES which reflected adversely on the drug's safety and efficacy.
- DES would not have been on the market, and would not have been available. to be prescribed by Dr. Montag, if Lilly had made full disclosure to the FDA.
- Lilly falsely promoted DES as safe and effective for use in pregnancy.
- Lilly's testing on humans and animals for safety and efficacy was negligent and below industry standards.
- Lilly's post-marketing testing for human and animals for safety and efficacy was negligent and below industry standards.
- Lilly failed to evaluate the teratogenicity of DES after the thalidomide crisis demonstrated that drugs taken during pregnancy affected the fetus.

These statements are sufficient to plead causes of action for negligent misrepresentation

and breach of warranty. *See, e.g., Cummings v. HPG Int'l Inc.*, 244 F.3d 16 (1st Cir. 2001);

*Back v. Wickes*, 378 N.E.2d 964 (Mass. 1978). In addition, however, the testimony of

Plaintiff's expert, Brian Strom, MD, MPH, provides substantive evidence in support of

Counts III and IV. **Exhibit L**, Supplemental Statement of Brian Strom, MD MPH.

### F.    Punitive Damages Allowed

Plaintiff has pled and is entitled to recover punitive damages against Defendant in this

wrongful death action. *See* Amended Complaint (Doc.#12) at ¶31; Annot. Laws. of Mass.,

Ch. 229, § 2 (2000); *Santana v. Registrars of Voters of Worcester*, 502 N.E.2d 132, 135

(Mass. 1986); Product Liability Desk Reference, (Daller, ed., 2005) at 340. *See also,*

-52-

**Exhibit L**, Supplement Statement of Brian Strom, MD, MPH; **Exhibit Q**, Deposition of Paul Stolley MD, at 23.

## V.   CONCLUSION

Plaintiff has presented substantial, consistent and corroborative evidence, not refuted by Defendant, proving that his wife was exposed to diethylstilbestrol. Based on this evidence, a reasonable juror could easily find that Linda Davis was exposed to diethylstilbestrol, and not some other unknown drug; that the diethylstilbestrol to which she was exposed was made by Eli Lilly; and that her exposure to the drug was the cause of her cancer and death. Further, Plaintiff is entitled to the presumption that Dr. Montag would have read and heeded an adequate warning regarding the hazards of DES, if one had been given by Lilly. Plaintiff has carried his burden of demonstrating that the Defendant failed to warn of a non-obvious risk about which it knew or should have known. This gives rise to a duty on the part of Lilly to rebut the heeding presumption, but it has clearly failed to do so. In addition, the affidavits of Weaver and Sachs relied on by Defendant must be stricken and not considered by the Court. For the reasons set out in this Memorandum, Plaintiff respectfully requests that this Court deny the Defendant's Motion for Summary Judgment and set a firm date for the trial of this matter as soon as possible.

### REQUEST FOR HEARING

Pursuant to LCvR 7.1(f), Plaintiff requests oral argument on this matter at the Court's earliest convenience.

Respectfully submitted this 13ᵗʰ day of October, 2005,

PATRICIA MARTIN STANFORD, P.A.

/s/ Patricia Martin Stanford
PATRICIA M. STANFORD, ESQUIRE
Admitted *pro hac vice*
3609 Hendricks Avenue
Jacksonville, FL 32207
904-346-4215
904-346-4275 fax
pmslaw1@aol.com

and

Ross Annenberg, Esquire
Ellis Law Offices
33 Pleasant Street, Stuie 2
Worcester, MA 01609

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 13, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to jdillon@foleyhoag.com.

s/ Patricia M. Stanford
Attorney for Plaintiffs

-54-

# TABLE OF AUTHORITIES

Page

### CASES

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

*Anderson v. Liberty Lobby*, 477 U.S. 242, 249-50 (1986) . . . . . . . . . . . . . . . . . . . . . . -22-

*Babcock v. General Motors Corp.*, 1st Cir. Case No. 01-2270 . . . . . . . . . . . . . . . . . -35-

*Back v. Wickes*, 378 N.E.2d 964 (Mass. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -52-

*Baughn v. Eli Lilly and Company*, Case No. 03-2626-KHV,
USDC for District of Kansas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -50-

*Bohlin v. Eli Lilly and Company*, Case No. 03-CV-11577-MEL,
USDC for District of Massachusetts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -50-

*Bortell v. Eli Lilly and Company, et al;* Case No. 04-CV-00954-ESH . . . . . . . . . . . -50-

*Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652 (1st Cir. 1981) . . . . . . . . -12-, -44-

*Brookover v. Mary Hitchcock Memorial Hosp.*,
893 F.2d 411 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-, -29-

*Brooks v. Eli Lilly & Co.*, Case No.1:03-1796-EGS
(D.C. July 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -25-, -34-

*Bulthuis v. Rexall Corp.*, 789 F.2d 1315 (9th Cir.1986) . . . . . . . . . . . . . . . -24-, -25-, -34-

*Carmona v. Toledo,* 215 F.3d 124, 132 (1st Cir. 2000) . . . . . . . . . . . -11-, -47--49-, -51-

*Casale v. Eli Lilly & Co.*, Case No. 03-11833-DPW . . . . . . . . . . . . . . . . . . . . . . . . . -44-

*Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 39-40
(D.C.Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

*Commonwealth v. Ocasio*, 746 N.E.2d 469 (Mass. 2001) . . . . . . . . . . . . . . . . . . . . . -30-

*Cook v. Hoppin,* 783 F.2d 684 (7th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-

*Cummings v. HPG Int'l Inc.*, 244 F.3d 16 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . -52-

*Exxon Corp. v. FTC*, 663 F.2d 120, 126 (D.C.Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . -23-

*Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 16 (1st Cir.1986) . . . . . . . . . . . . . . . -47-

*Furtado v.Bishop*, 604 F.2d 80 (1st Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

*Garita Hotel Ltd. v. Ponce Fed. Bank*, F.S.B., 958 F.2d 15, 17
(1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -52-

*Garside v. Osco Drug*, 976 F.2d 77 (1st Cir 1992) . . . . . . -12-, -37-, -39-, -40-, -43-, -44-

*Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . -11-

*Harlow v. Chin*, 545 N.E.2d 602 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-, -38-

*Hibbs v. Abbott Labs, et al.*, 814 P.2d 1186
(Wash. Ct. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-, -45-

*Johnson v. Brown & Williamson*, 122 F. Supp. 2d 194, 198
(D. Mass. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -52-

*Knowlton v. Deseret Medical, Inc.*, 930 F.2d 116
(1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -37-, -38-, -43-, -45-

*Lipsett v. University of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988) . . . . . . . . . . . -11-

*Lovejoy v. United States*, 92 F.3d 628, 632 (8th Cir. 1996) . . . . . . . . . . . . . . . . -31-, -33-

*McCue v. Norwich Pharmacal Co.*, 453 F.2d 1033, 1035
(1st Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -44-

*Meyer v. U.S.*, 638 F.2d 155, 157 (10th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . -35-

*Perez v. Volvo Car Corp.*, 247 F.3d 303, 314 (1st Cir. 2001) . . . . . . . . . . . . . . . . . -47-

*Petrocelli v. Gallison*, 679 F.2d 286, 289-90 (1st Cir.1982) . . . . . . . . . . . . . . . . . . . -32-

*Robinson v. Bodoff*, 355 F.Supp.2d 578 (D.Mass.2005) . . . . . . . . . . . . . . . . . . . -47--49-

*Santana v. Registrars of Voters of Worcester*, 502 N.E.2d 132, 135
(Mass. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -52-

*Schubert v. Nissan Motors,* 148 F3d 125, 130 (1st Cir 1998) . . . . . . . . . . . . . . .  -48-, -51-

*Seley v. G. D. Searle & Co.,* 423 N.E.2d 831, 837 (1981) . . . . . . . . . . . . . . . . . . . . .  -37-

*Shields v. Eli Lilly & Co.,* 895 F.2d 1463, 1465 (D.C. Cir. 1990) . . . .  -11-, -21--25-, -34-

*U.S. v. Balzano,* 687 F.2d 6 (1st Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -30-

*U.S. v. Carroll,* 860 F.2d 500 (1st Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -30-

*U.S. v. Hall,* 165 F.3d 1095, 1110 n.8 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . .  -27-

*U.S. v. Iron Shell,* 633 F.2d 77 (8th Cir.1980),
*cert. den.,* 450 U.S. 1001 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -33-

*U.S. v. Newman,* 982 F.2d 665, 668 (1st Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . .  -35-, -36-

*U.S. v. Nivica,* 887 F.2d 1110 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -28-

*Uloth v. City Tank Corp.,* 384 N.E.2d 1188 (Mass. 1978) . . . . . . . . . . . . . . . . . . . . .  -12-

*United States v. Dibble,* 429 F.2d 598, 602 (8th Cir. 1970) . . . . . . . . . . . . . . .  -48-, -49-

*Woolfolk v. Eli Lilly & Co.,* Case No. C03-3577RSM,
(W.D.Wa. Mar. 15, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -24-, -25-, -32-, -34-

RULES AND STATUTES

ANNOTATED LAWS OF MASSACHUSETTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -52-

FEDERAL RULES OF CIVIL PROCEDURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -11-, -48-, -51-

FEDERAL RULES OF EVIDENCE . . . . . . . . . . . . . . . . . .  -26-, -27-, -29--33-, -35-, -36-, -51-

MASSACHUSETTS RULES OF EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -30-

RESTATEMENT (SECOND) OF TORTS, §402A (1965) . . . . . . . . . . . . . . . . . . . . . . . . . .  -37-

MEDICAL AUTHORITIES

Bongiovanni, et al., *Masculinization of the female infant associated
with estrogenic therapy alone during gestation*, 19 J. OF CLIN. END.
AND MET. 1004 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

Cunningham, et al, WILLIAMS OBSTETRICS,19th ed. (Appleton & Lange 1993) . . . . . -16-

Dieckmann, et al., *Does the Administration of Diethylstilbestrol During
Pregnancy Have Therapeutic Value?*, 66:5 Am. J. Obstet. Gynecol.,
1062-1081 (November 1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -41-

Eli Lilly and Company, *De Re Medica*, (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

PHYSICIANS' DESK REFERENCE . . . . . . . . . . . . . . . . . . . . . . . . -10-, -37-, -42-, -46-, -48-

STEDMAN'S MEDICAL DICTIONARY, 25th ed. (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

TABER'S CYCLOPEDIC MEDICAL DICTIONARY, 16th ed. (1989) . . . . . . . . . . . . . . . . . -12-

THE MERCK MANUAL, 15th ed. (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-


OTHER AUTHORITIES

Centers for Disease Control, *DES Update*,
available at www.cdc.gov/des . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-, -33-

Daller, ed., PRODUCT LIABILITY DESK REFERENCE (2005) . . . . . . . . . . . . . . . . . . . . . -52-

Foley Hoag, LLP, Attorney Profiles at
http://foleyhoag.com/attorney.asp?aID=000325149901 . . . . . . . . . . . . . . . . . . . . . . . -10-

Saltzburg, et al; FEDERAL RULES OF EVIDENCE MANUAL,
7th ed.(1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-

**INDEX OF EXHIBITS**

| | |
|---|---|
| Exhibit A | Deposition of Dorothy Manning |
| Exhibit B | Deposition of Joyce Montag Greenberg |
| Exhibit C | Affidavit of Daphne Abodeely |
| Composite Exhibit D | Deposition of Joseph L. Rossetti, R.Ph., Affidavit of Joseph L. Rossetti, R.Ph., and Sworn Supplemental Statement of Joseph L. Rossetti, R.Ph. |
| Exhibit E | Affidavit of Russell E. Johnson, M.D. |
| Composite Exhibit F | Certified Copy of Birth Certificate and Certificate of Death of Linda Marie White Davis |
| Exhibit G | Plaintiff's Answers to Eli Lilly and Company's First Set of Interrogatories |
| Exhibit H | Discovery Deposition Transcript of Linda Davis |
| Composite Exhibit I | Affidavit of Patricia M. Stanford, Esquire with Attached Excerpts of Medical Records from Lucille D. Pohley, M.D., Fallon Clinic, Saint Vincent Hospital, n/k/a Worcester Medical Center, and E. Russell Young, D.O. |
| Composite Exhibit J | Deposition of Susan Zweizig, M.D. and Expert Report |
| Composite Exhibit K | Defendant Eli Lilly and Company's Responses to Plaintiff's First Set of Interrogatories and Supplemental Responses to Plaintiff's First Set of Interrogatories |
| Exhibit L | Supplemental Statement of Brian L. Strom, M.D., M.P.H. |
| Exhibit M | 1960 and 1961 Physicians' Desk Reference and Verification of Heather Snyder |
| Exhibit N | Affidavit of Therese Silva with Attached Excerpts of Medical Records from George F. Clancy, M.D. |

Exhibit O                        Order on Motion for Summary Judgment, *Woolfolk v. Eli Lilly & Co.*, C03-3577RSM, USDC, W.D.Wa., March 14, 2005

Exhibit P                        Statement of Harold B. Sparr, R.Ph., M.Ph., M.S.

Exhibit Q                        Deposition Excerpt of Paul Stolley, M.D.

Exhibit R                        Letter from D.C. Hines, M.D., Medical Director of Eli Lilly and Company, to Dr. J.A. Morrell, E.R. Squibb & Sons, dated May 13, 1941