1        UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF MASSACHUSETTS

3

4   - - - - - - - - - - - - - -

5   BARRY DAVIS, Individually,   :

6   and as Administrator of      :

7   The Estate of LINDA MARIE    :

8   DAVIS, Deceased,             :    04-10349(MEL)

9           Plaintiff,           :

10          vs.                  :

11  ELI LILLY AND COMPANY,       :

12          Defendant.           :

13  - - - - - - - - - - - - - -

14

15      DEPOSITION OF JOYCE MONTAG GREENBERG

16          Worcester, Massachusetts

17        Wednesday, September 21, 2005

18               9:08 A.M.

19

20

21  Pages 1 - 48

22  Reported by:  Jacqueline P. Shields, RPR, CSR

23

24

Page 2

1  Deposition of Joyce Montag Greenberg, held
2  at the offices of:
3
4     MICHAEL N. ABODEELY, JR., Esquire
5     28 Mechanic Street
6     Worcester, Massachusetts 01608
7
8     Pursuant to Notice, before Jacqueline P.
9  Shields, Registered Professional Reporter and Notary
10 Public of the State of Massachusetts.

Page 3

1  APPEARANCES:
2
3     PATRICIA M. STANFORD, P.A.
4     BY: PATRICIA M. STANFORD, Esquire
5     (via telephone)
6     3609 Hendricks Avenue
7     Jacksonville, Florida 32207
8     for the Plaintiff
9
10    FOLEY HOAG, LLP
11    BY: BRIAN L. HENNINGER, Esquire
12    (via telephone)
13    155 Seaport Boulevard
14    Boston, Massachusetts 02111-2600
15    for the Defendant
16
17    MICHAEL N. ABODEELY, JR., Esquire
18    28 Mechanic Street
19    Worcester, Massachusetts 01608
20    for the Deponent.

Page 4

1              INDEX
2  Testimony of:    Direct   Cross   Redirect   Recross
3  JOYCE MONTAG GREENBERG
4  By Mr. Henninger   5              39
5  By Ms. Stanford            30              --
6
7
8            EXHIBITS
9
10
11 Exhibit No.    Description         For I.D.
12
13  1  supplemental affidavit of Joyce
14     Montag Greenberg dated August 25,
15     2005.                              8
16
17  2  affidavit of Joyce Montag Greenberg    9
18
19
20
21
22    EXHIBITS APPENDED TO ORIGINAL TRANSCRIPT

Page 5

1            STIPULATIONS
2     It is hereby stipulated and agreed
3  by and between counsel for the respective parties
4  that the deposition will proceed under the Federal
5  Rules of Civil Procedure.
6     JOYCE MONTAG GREENBERG, having been
7  satisfactorily identified and duly sworn by the
8  Notary Public, was examined and testified as follows:
9            DIRECT EXAMINATION
10 BY MR. HENNINGER:
11    Q. Good morning, Ms. Greenberg.
12    A. Good morning.
13    Q. My name is Brian Henninger. I've spoken
14 with you at least one time before, and I'm counsel
15 for Eli Lilly and Company in this case.
16       Have you ever been deposed before?
17    A. No.
18    Q. Okay. Just a couple of instructions. I'm
19 sure that your attorney's discussed some of the
20 things that are going to go on here today. Let me
21 tell you how things are going to happen from my
22 perspective.
23       We're here to find out all the knowledge
24 that you have about your father, Dr. Montag's

Page 6

1  prescription practice with respect to
2  diethylstilbestrol.
3      I'm going to ask you a series of questions.
4  I want you to give me the most complete and truthful
5  answer that you can.
6      If you have any questions about my
7  questions, if you don't understand them or if they're
8  not clear to you in any way you should feel free to
9  ask me to rephrase that question.
10     If you need to take a break for any reason
11 you can do that. I don't anticipate this deposition
12 going any longer than an hour. I hope we can go
13 straight through.
14     And a couple of things for the court
15 reporter and those of us here on the phone, since
16 we're not in front of you it's going to be very
17 important that you answer all of my questions
18 verbally. That you not shake your head or nod your
19 head. And also another tip so that it's easier for
20 the court reporter, if you'll try to be patient to
21 make sure that I have all of my question out before
22 you begin to answer, that will be better because it's
23 difficult for a court reporter to take down two
24 people talking at once.

Page 7

1      Do you understand all of those instructions?
2   A. Yes, I do.
3   Q. Do you have any questions for me before we
4  go on?
5   A. No, I don't.
6   Q. Okay. Could you just state your full name
7  and your address for the record?
8   A. Joyce Montag Greenberg. Ten Brook Hill,
9  separate words, Brook Hill Drive, Worcester, Mass,
10 01609.
11  Q. And what's your date of birth?
12  A. 10/15/40.
13  Q. Okay. And why don't we, just to get things
14 started, and enter both of Mrs. Greenberg's
15 statements into the record.
16     Do you have both of those statements there,
17 Mrs. Greenberg?
18         MR. ABODEELY: Do you mean the
19 affidavits?
20         MR. HENNINGER: Yes.
21         MR. ABODEELY: Yes, we do.
22         MR. HENNINGER: Okay. Why don't we
23 -- if you don't mind, let's enter the supplemental
24 affidavit that's dated August 25th, let's enter that

Page 8

1  as Exhibit 1.
2          MR. ABODEELY: This is the one
3  right here. We'll take copies later.
4          MR. HENNINGER: And just let me
5  know when you're all set, Jackie.
6          MR. ABODEELY: Brian, excuse me,
7  was the list, and again maybe it's my fault, was the
8  list of the individuals in 1961 part of the long
9  affidavit or just the first one?
10         MR. HENNINGER: Just the first one
11 is my understanding. Is that correct, Patty?
12         MS. STANFORD: That's correct.
13         MR. ABODEELY: Okay, that's my
14 fault. We've corrected that.
15         MR. HENNINGER: Okay. Are we all
16 set?
17         MR. ABODEELY: Yes.
18         (Exhibit No. 1, marked;
19 supplemental affidavit of Joyce Montag Greenberg
20 dated August 25, 2005.)
21         MR. HENNINGER: Just to make sure,
22 Exhibit 1 is the supplemental affidavit dated
23 August 25, 2005.
24         MR. ABODEELY: Correct.

Page 9

1          MR. HENNINGER: Okay. And have we
2  already marked Exhibit No. 2?
3          MR. ABODEELY: Right here.
4   Q. Directing your attention to Exhibit No. 2,
5  just for a moment -- --
6          MR. ABODEELY: Hang on, Brian.
7  Excuse me, she hasn't marked it yet. She's going to
8  mark it right now.
9          (Exhibit No. 2, marked; affidavit
10 of Joyce Montag Greenberg.)
11         MR. HENNINGER: Thank you.
12  Q. I'm sorry, if I can direct your attention
13 back to Exhibit 1. You note that your father, Paul
14 P. Montag is deceased. Can you tell me when he
15 passed away?
16  A. In April of 1996.
17  Q. Okay. And is your mother still alive?
18  A. No.
19  Q. Okay. And when did she pass away?
20  A. November of 1994.
21  Q. Okay. And you mentioned also in your
22 supplemental affidavit, which is Exhibit No. 1, that
23 there was a nurse who was working with your mother
24 and your father in your father's office. Do you know

Page 10

1  if that person is still alive?
2     A. She died.
3     Q. What was his name?
4     A. Her name was Mary Gendron.
5     Q. Okay.
6        MS. STANFORD: Can you spell her
7  last name, Mrs. Greenberg?
8        The Witness: I believe it was
9  G-E-N-D-R-O-N.
10       MS. STANFORD: Okay. Thank you.
11    Q. Okay. Mrs. Greenberg, how old were you when
12 you started working with your father in his office?
13    A. I lived next door to the office in 1962 to
14 1969 and I would just go in and help out if they
15 needed some help.
16    Q. Okay. And so it was an as needed thing or a
17 regular part-time basis?
18    A. No, as needed. If I was around.
19    Q. Could you approximate for me about how often
20 it happened that you worked in his office?
21    A. I later worked in his office. Let's see, in
22 the -- let me see if I can remember when I -- 20, 30,
23 40, 50, 60, maybe in the '70s. In the '70s I would
24 go in and help out part-time.

Page 11

1     Q. Okay. Going back to the time that you
2  worked there from 1962 until 1969, can you
3  approximate approximately how frequently you worked
4  in his office?
5     A. I just lived next door. If they needed
6  something they would come and ask me and I would go
7  in and help.
8     Q. Would it be a couple of times a month? A
9  couple of times a week?
10    A. Maybe a couple times a month.
11    Q. Okay. And from 1962 until 1969 were there
12 any significant gaps where, you know, you didn't work
13 for your father? Where you were either traveling or
14 for any reason that you didn't work?
15    A. Well, I lived next door, but I had a baby in
16 1968.
17    Q. Okay. And jumping down then to the time
18 period in the 1970s that you said that you worked for
19 your father part-time, do you know about how long
20 that was? What year until what year?
21    A. I don't. It was until he retired.
22    Q. Which was in 1985 I believe?
23    A. Uh-huh.
24       MR. ABODEELY: Say yes.

Page 12

1        The Witness: Yes.
2     Q. Okay. And during that time period was your
3  schedule regular or was it, again, on an as needed
4  basis?
5     A. No, it was regular but the practice was much
6  smaller. There was no more deliveries of babies.
7     Q. Okay. And so what was your schedule during
8  the '70s?
9     A. A couple times a week.
10    Q. Okay. At any time in your life had you had
11 any medical training as a nurse or a physician?
12    A. No. Just a speech therapist.
13    Q. Okay. Okay. I just want to ask a couple of
14 questions about your roles in the office and the
15 roles that other people have played according to your
16 statement.
17       In Exhibit No. 1, your supplemental
18 affidavit, you mentioned that your mother worked in
19 the office handling mostly administrative matters.
20 Could you tell me what those administrative matters
21 were in as much detail as you can?
22    A. All the finances.
23    Q. Okay.
24    A. All the books. All the listing of

Page 13

1  deliveries. Answering the phones when the nurse
2  wasn't there and the service, she would pick up
3  because he was constantly on call.
4     Q. Okay. Anything else?
5     A. No.
6     Q. Okay. You knew that there was a nurse who
7  worked with the doctor in the office. Can you tell
8  me, I think it was Mary Gerndown, was that it?
9     A. Gendron.
10    Q. Gendron. I'm sorry. Can you tell me what
11 you recall her role being as specifically as you can?
12    A. Just taking urines, blood pressure, and
13 keeping records.
14    Q. Okay.
15    A. And being in the room. Being in the room
16 when patients were examined.
17    Q. Okay. Anything else?
18    A. No.
19    Q. Who, if anyone did, who ordered medical
20 supplies for the office?
21    A. I don't know.
22    Q. Okay. And do you know who stocked medical
23 supplies when they actually came into the office?
24    A. I don't know.

Page 14

1  Q. Okay. Okay. Can you tell me now -- we
2  talked about the other folks, what specifically were
3  your roles in the office? I know from your statement
4  here you say that you did things such as greet and
5  escort patients, take and record blood pressure
6  readings, and follow any instructions given to you by
7  my father and or his nurse?
8  A. Yeah, I could test urine.
9  Q. And you tested urine as well?
10 A. Yes.
11 Q. Okay. And were there any other tasks that
12 you can remember?
13 A. No.
14 Q. Did you assist your father during patient
15 consultations?
16 A. No.
17 Q. So you were never in the room for those
18 consultations?
19 A. No.
20 Q. Did you ever take patient histories?
21 A. No.
22 Q. Did you yourself ever have anything to do
23 with either stocking or ordering medical supplies?
24 A. No.

Page 15

1  Q. Did you ever create medical, make notations
2  in medical records?
3  A. Yes, if I were helping out.
4  Q. Okay. And would that be restricted to the
5  urine analysis or the blood pressure results?
6  A. Yes.
7  Q. Okay. Did you file medical records?
8  A. I filed the records that I wrote on and put
9  them back in the file box.
10 Q. Okay. When you did that did you make a
11 point of reading the records?
12 A. Some.
13 Q. Okay. Did you ever participate in your
14 father's phone consultations?
15 A. No.
16 Q. Did you ever call in prescriptions for your
17 father's patients?
18 A. No.
19 Q. Did you ever have anything to do with
20 administering medications to your father's patients?
21 A. No.
22 Q. Did you ever prepare any pregnancy records
23 for hospitals?
24 A. No.

Page 16

1  Q. Did you answer telephones in the office?
2  A. Yes, if I was there.
3  Q. Okay. Okay. Looking to Exhibit No. 2 now,
4  and I'm specifically referring to the list of
5  patients that was attached to that.
6  A. Uh-huh.
7  Q. Okay. Did you ever make entries into this
8  registry?
9  A. No. That's my mother's handwriting.
10 Q. Okay. And looking at this registry can you
11 tell whether or not any of these people had been
12 prescribed DES by your father? Excuse me,
13 diethylstilbestrol?
14 A. No.
15 Q. And we see here number 91, Dorothy White in
16 particular. You can't tell from looking at this
17 whether or not she had been prescribed
18 diethylstilbestrol; is that correct?
19 A. No.
20 Q. Okay. The last thing in your -- going back
21 to Exhibit No. 1 now, you stated that you would also
22 follow any other instructions given to me by my
23 father or his nurse. Can you think of any
24 instructions you were given that we haven't talked

Page 17

1  about that would be part of your role in your
2  father's office?
3  A. Water flowers.
4  Q. Okay. That's an important job.
5  A. Yeah. Menial tasks.
6  Q. Yes. Can you tell me what's your
7  understanding of the purpose of prescribing
8  diethylstilbestrol was?
9  A. To prevent risk pregnancies.
10 Q. Okay. And to the best that you can recall
11 when did you first understand this purpose?
12 A. When my friend took it.
13 Q. And when was that?
14 A. Well, she had a baby in 1962, so I don't
15 know exactly when. Probably -- I don't know when in
16 her pregnancy she took it.
17 Q. Okay. Other than this time when you first
18 found out about it have your understanding of the
19 purpose of that drug changed at all?
20 A. No.
21 Q. Okay. Are you aware of any other treatments
22 for problem pregnancies or history of miscarriages
23 other than diethylstilbestrol?
24 A. No.

Page 18

1  Q. In the course of your work in your father's
2  practice did you ever hear of estrogen may affect the
3  cholesterol?
4  A. No.
5  Q. How about benzestrol?
6  A. No.
7  Q. Do you know whether or not your father had
8  ever prescribed simple bedrest for problem
9  pregnancies?
10  A. I would assume, but I don't know.
11  Q. Okay. Do you know if your father regularly
12  prescribed vitamins for problem pregnancies?
13  A. I don't know. For normal pregnancies he
14  did.
15  Q. He did. Okay. Were you aware at the time
16  that you were working in your father's office that
17  there was in fact more than just diethylstilbestrol
18  to treat problem pregnancies or history of
19  miscarriages?
20      MS. STANFORD: Objection to the
21  form.
22  A. No.
23  Q. I'm sorry, you can answer the question.
24  A. No.

Page 19

1  Q. Okay.
2      MS. STANFORD: I'm sorry, for the
3  court reporter, that was Patty Stanford on that
4  objection.
5  Q. Did you ever have any specific conversations
6  with your father about his prescription practice with
7  respect to diethylstilbestrol?
8  A. No, not -- later on when there was
9  literature about it that became public but no, not
10  then.
11  Q. Okay. And what did your father tell you
12  about his prescription practice when the literature
13  came out?
14  A. I know he felt badly.
15  Q. Did he ever say anything to you whether or
16  not he ever prescribed anything other than
17  diethylstilbestrol for problems in pregnancy or
18  history of miscarrying?
19  A. No.
20  Q. So at this point then I guess it's fair to
21  say you just don't know whether or not he actually
22  prescribed anything other than diethylstilbestrol for
23  those symptoms?
24      MS. STANFORD: Objection to form.

Page 20

1  Q. Sorry, can you repeat your answer?
2  A. No, I don't know.
3  Q. Okay. As you know, we're here for a
4  specific case, referring to Exhibit No. 2 again, the
5  patient who is number 91 on here is the person that
6  we're concerned about. You have knowledge whether or
7  not Dorothy White was actually exposed to
8  diethylstilbestrol, do you?
9  A. No.
10  Q. Okay. In your supplemental statement, this
11  is Exhibit No. 1 again, you state that your father
12  regularly received visits and literature from drug
13  company representatives, and I am quite sure that he
14  kept abreast of current information regarding
15  treatment and medicines that he used in his practice.
16  I just want to ask you a couple of questions about
17  that.
18  A. Uh-huh.
19  Q. Can you tell me other than the visits and
20  the literature if you're aware of any other sources
21  that your father used to keep abreast of the
22  information about the treatments and the medicines
23  that he used?
24  A. Conferences.

Page 21

1  Q. Okay.
2  A. And the American Medical Society literature.
3  Q. Okay.
4  A. He read constantly.
5  Q. Can you recall anything else that he read
6  often?
7  A. There was an obstetrical magazine too.
8  Q. You can't remember the title?
9  A. No. I remember the color.
10  Q. How about textbooks, do you know if your
11  father referred to any textbooks regularly?
12  A. Well, he had a huge library in the office.
13  Q. Uh-huh. But you don't know whether he got
14  any, you don't know whether he did research referring
15  to those all the time or not?
16  A. No, but he was very tuned-in.
17  Q. Right. Okay. How about conversations with
18  other doctors, did he often discuss drugs with other
19  doctors to the best of your knowledge?
20  A. I don't know.
21  Q. Okay. You mentioned here that drug company
22  representatives often visited your father and when
23  they did that they would drop off literature to him?
24  A. Yes. And he would meet with many detail

Page 22

1  men.
2    Q. Okay. Were you ever a part of any of those
3  conversations?
4    A. No.
5    Q. Do you know whether or not your father asked
6  about the risks that were associated with medication
7  during any of those conversations?
8    A. No.
9    Q. Do you know if your father actually wrote --
10 let me just be clear, so I'll start again.
11      I understand that your father did meet with
12 detail men and representatives from pharmaceutical
13 companies there in his office. The question I will
14 ask you now, do you know if your father ever sent
15 away or requested materials about a specific drug
16 from a pharmaceutical company?
17   A. I think birth control pills.
18   Q. Okay. Is that the only medication that you
19 know of?
20   A. That I can remember. They were good for
21 plants.
22   Q. They were good for what?
23   A. Plants.
24   Q. Okay. Okay. Any other sources that we

Page 23

1  haven't mentioned that you know of that your father
2  may have gotten information about the drugs that he
3  prescribed from?
4    A. I don't know.
5    Q. Do you know if your father kept literature
6  about the drugs that he prescribed on file?
7    A. I don't know.
8    Q. Were you ever a part of having to update
9  files on pharmaceutical drugs?
10   A. No.
11   Q. Okay. Looking -- actually, this is
12 something that you say in both statements. We will
13 look at Exhibit No. 1 here. You note that it was
14 your father's practice during the 1950s and 1960s to
15 prescribe diethylstilbestrol to patients who had
16 problematic pregnancies or a history of miscarriage.
17 I just want to ask you about that for a second.
18      Can you tell me exactly what you mean by a
19 problematic pregnancy?
20   A. At risk pregnancies for miscarriages.
21 That's all I knew it was used for.
22   Q. And how would you describe what an at risk
23 pregnancy is? Were there specific symptoms that
24 there were?

Page 24

1    A. Usually people stained.
2    Q. Okay. Any other symptoms?
3    A. No, not that I know. No, I guess I didn't
4  examine them.
5    Q. Okay. And then you also talk about history
6  of miscarriage. Can you tell me what you mean by
7  history of miscarriage?
8    A. Let me look at the statement. Where is it?
9    Q. It's at the very bottom and goes over to the
10 second page.
11   A. They would be people who would be at risk
12 for pregnancies.
13   Q. Okay. What I really want to know about that
14 history of miscarriage is whether or not you know if
15 there was a specific number of miscarriages that your
16 father needed to see before he prescribed it for
17 history of miscarriage?
18   A. I don't know.
19   Q. Do you remember -- put it this way, have you
20 ever seen any of your father's prescriptions for
21 diethylstilbestrol?
22   A. No.
23   Q. Okay. So you don't know then what dose he
24 use to prescribe it in?

Page 25

1    A. No.
2    Q. Do you know if he prescribed, do you know
3  whether he prescribed any specific brand of
4  diethylstilbestrol?
5    A. No. I only know what my friend took and you
6  would have to ask her.
7    Q. Okay. And do you know what your father
8  usually did as far as how long he told his patients
9  to take diethylstilbestrol?
10   A. No idea.
11   Q. Okay. We are almost finished. Just a
12 couple of questions about the -- let me ask this
13 first, you state in your, in your first statement,
14 which is Exhibit No. 2 here, that the complete
15 medical, the complete patient records for my father's
16 practice no longer exist. Do you know who was the
17 keeper of those records before they were destroyed?
18   A. He had them until age 90.
19   Q. Okay.
20   A. And then we, he threw them out.
21   Q. Okay. So they were just in the trash?
22   A. Yes.
23   Q. Okay. And the only records that you have
24 left now is the book from which the Exhibit 2, the

Page 26

1  attachment to Exhibit No. 2 here came from?
2      A. Yes.
3      Q. List of patients?
4      A. Yes, that's it.
5      Q. Okay. Can you tell me the name of the
6  acquaintance that you know who also was prescribed
7  diethylstilbestrol?
8      A. Daphne Abodeely.
9      Q. And is the last name spelled the same as
10 your attorney there?
11     A. Yes.
12     Q. And is that a relation of your attorney?
13     A. Yes.
14     Q. I'm sorry, did you hear the question?
15     A. Yes. I said yes.
16     Q. I'm sorry, I didn't hear that. What's the
17 relation; if you know?
18     A. Her husband.
19     Q. Okay. Do you know if, do you know if Mrs.
20 Abodeely's exposure to diethylstilbestrol was ever
21 confirmed through medical records of your fathers?
22     A. Yes.
23     Q. Do you know if she has any of those medical
24 records?

Page 27

1      A. Yes.
2      Q. Does she have them?
3      A. Yes.
4      Q. Okay. We will deal with that later. A few
5  questions now about yourself, these statements and
6  how they came about.
7          When was the first time that you spoke with
8  Ms. Stanford about the first statement that you
9  signed, which is Exhibit No. 2 here?
10     A. I don't remember the date. Let's see. It
11 would be -- this is the -- I can't give you a date.
12     Q. That's fine. If you can approximate a month
13 or a year?
14         MR. ABODEELY: How long ago is what
15 he's asking did you talk to Attorney Stanford in
16 reference to this.
17         The Witness: Within the year.
18     Q. Okay. Do you know if it was this summer or
19 earlier than this summer, in the spring?
20     A. I don't even remember. It was not a major
21 part of my life.
22     Q. Okay. And the person who witnessed Exhibit
23 No. 2, which is your first statement, is that your
24 husband?

Page 28

1      A. Yes. Yes.
2      Q. Okay. And what's his full name? It's
3  difficult to read his writing there.
4      A. Mel L. Greenberg.
5      Q. Okay. And can you tell me what you recall
6  about how the statement came about? Did you actually
7  draft this statement or did Ms. Stanford send it to
8  you?
9      A. We discussed it and she wrote it up.
10     Q. Okay. And then you looked it over to make
11 sure it was accurate and signed it?
12     A. Yes.
13     Q. Okay. And do you remember who specifically
14 did you speak with in Ms. Stanford's office about
15 this statement? Was it Ms. Stanford herself?
16     A. Yes.
17     Q. Okay. Okay. And then moving to the second
18 statement, do you recall when the first time was that
19 you discussed with anyone from Ms. Stanford's office
20 the second statement, which is Exhibit No. 1 here?
21     A. Not too long ago, but I don't remember the
22 date.
23     Q. Okay. Was it long before August 25th or was
24 it right around that time?

Page 29

1      A. I don't know.
2      Q. And was the process the same for this one,
3  you talked further about it and then she drafted this
4  up?
5      A. Yes.
6      Q. Okay. And you looked it over to make sure
7  it was accurate and then signed?
8      A. Yes.
9      Q. And looking at these statements today in
10 preparation for your deposition is there anything
11 that you would want to change about them?
12     A. No. No.
13     Q. For example, I'm thinking specifically about
14 where you say in Exhibit No. 1, which is the
15 supplemental affidavit, that it was your father's
16 standard and custom and practice during the 1950s;
17 since you began working with your father in 1962 can
18 you really say whether or not he was prescribing
19 diethylstilbestrol regularly in the 1950s?
20     A. I can't say anything. I don't know, but
21 it's based on a continuation. So it was an
22 assumption.
23     Q. Okay. So you don't have personal knowledge
24 that that actually occurred?

Joyce Montag Greenberg

Page 30

1           MS. STANFORD: Objection to the
2   form.
3       A. No.
4       Q. Okay. Have you received any kind of
5   compensation from Ms. Stanford for your trouble in
6   going through these statements?
7       A. No.
8           MR. HENNINGER: Okay. I think
9   that's all that I have. I want to thank you very
10  much for your time. I know that this was a little
11  confusing and hectic process. Thank you for coming
12  in and doing this and I appreciate that.
13          Ms. Stanford may have some questions for
14  you.
15          MS. STANFORD: Joyce, I do have a
16  few questions. Can you hear me okay?
17          The Witness: Yes.
18          MS. STANFORD: Okay.
19          CROSS EXAMINATION
20  BY MS. STANFORD:
21      Q. You mentioned that you first actually
22  started working in your dad's office in 1962. His
23  office had been in operation prior to that time; is
24  that correct?

Page 31

1       A. Yes, we lived in the house.
2       Q. And you also lived in the house prior to
3   that time?
4       A. I grew up in that house, yes.
5       Q. Okay. So you were in the house during the
6   1950's and during the time he was conducting a
7   medical practice during the 1950's; is that correct?
8       A. Yes.
9       Q. Do you have any reason to believe that he
10  had some drastic change in the type of practice he
11  conducted, especially with respect to
12  diethylstilbestrol between -- from the time you began
13  working in his office in 1962?
14      A. No.
15      Q. In other words, is it your belief based on
16  what you knew about his practice both before you
17  worked in the office and subsequently, it was your
18  belief that prescribing diethylstilbestrol to
19  patients with at risk pregnancies was a practice he
20  had conducted even before you worked for him?
21          MR. HENNINGER: Objection as to
22  form and foundation.
23          MS. STANFORD: You can answer the
24  question, if you understand it.

Page 32

1       A. If he were consistent then yes, but that
2   would be only an assumption.
3       Q. Sorry, can you repeat that? I didn't quite
4   hear you.
5       A. If he were consistent in using the same
6   medication the answer would be yes, but I don't know.
7       Q. Would it be your impression of him, knowing
8   him as your father and as a doctor, that he would
9   have been consistent in his practice?
10          MR. HENNINGER: Objection. You can
11  answer if you know the question.
12      A. He would only do what he thought was best
13  for the patient.
14      Q. Okay. And also on that vain, you mentioned
15  that your dad spoke with a number of detail men and
16  reviewed literature and that sort of thing. In your
17  opinion knowing what you knew about him as a person
18  and as a physician do you believe that he would have
19  prescribed any medication if he felt that it posed
20  risks to the patient?
21      A. No.
22      Q. Do you believe he would have prescribed
23  diethylstilbestrol if he believed that it posed any
24  risk to either the patient or her child?

Page 33

1       A. No.
2       Q. Do you believe that he had been told of any
3   risks or given any warnings about potential risks
4   concerning diethylstilbestrol for either the patient
5   or the child?
6           MR. HENNINGER: Objection.
7       A. He would only do what he thought was best
8   for the patient.
9       Q. Okay. Let me back up. We talked a little
10  bit about the sheet that was attached to your first
11  affidavit, which I think is actually Exhibit 2, and
12  that contained a list of different patient's names?
13      A. Yes.
14      Q. That was a copy from a book of some sort?
15      A. Yes. I have a book with several thousand
16  deliveries.
17      Q. Did you yourself actually physically make
18  that copy from the book?
19      A. Yes.
20      Q. So that's a true and correct copy of a page
21  from a book of Dr. Montag in which his deliveries
22  were listed?
23      A. Yes. I have the original with me.
24      Q. Okay. Do you know of any other custodians

Page 34

1  of any of Dr. Montag's records?
2      A. No.
3      Q. I want to ask you a couple of doctor's
4  names. From what I understand -- did Dr. Montag have
5  a very popular practice in Worcester?
6      A. Yes.
7      Q. You mentioned that he was always on call.
8  Did he ever share call or get assistance from any
9  other physicians?
10     A. Yes, there were a few doctors who covered
11  for one another occasionally.
12     Q. Okay. Do you remember a Dr. Edward
13  Fairbanks?
14     A. The name. The name.
15     Q. Do you know if Dr. Fairbanks ever covered
16  for Dr. Montag?
17     A. I don't know.
18     Q. Do you know or recall the name Dr. George
19  Clancy?
20     A. Yes.
21     Q. Do you know whether Dr. Clancy ever covered
22  or shared call with Dr. Montag?
23     A. Yes, he did.
24     Q. Okay. Do you recall the name Dr. Michael

Page 35

1  Scricco?
2      A. Yes.
3      Q. Do you know whether Dr. Scricco ever covered
4  for your dad?
5      A. He might have.
6      Q. And how about Dr. Russel Johnson, do you
7  recall that name?
8      A. I don't think so. I mean, I know who he is.
9  No, I don't think so.
10     Q. Okay. Did Dr. Montag ever actually have an
11  on-site partner? Someone who, another doctor who
12  worked with him in the office?
13     A. No.
14     Q. And you mentioned the time 1962 as when you
15  first started working for your dad. Prior to that
16  time would you have occasion to simply be in his
17  office from time to time?
18     A. Yes. I could drop in.
19     Q. Okay. So it's not as though you were
20  completely unaware of his medical practice before
21  1962, correct?
22         MR. HENNINGER: Objection.
23     A. I knew he had a practice.
24     Q. Pardon me?

Page 36

1      A. I knew he had a practice.
2      Q. Okay. And would you see patients go in and
3  out?
4      A. Yes.
5      Q. Did you know any patients prior to 1962 who
6  were prescribed diethylstilbestrol by your dad?
7      A. I don't know. Just my friend Daphne.
8      Q. Okay. Do you know how many pregnancies
9  Daphne had?
10     A. Two.
11     Q. Okay. Do you know the years?
12     A. I know she had a child in '62 and '66.
13     Q. Okay. Just a couple more follow-ups here.
14  Do you know whether Dr. Montag ever suggested any
15  particular pharmacies to his patients in terms of
16  where they might want to have their prescription
17  filled?
18     A. I know Tech Pharmacy on Highland Street was
19  very popular then.
20     Q. And do you know the name of the pharmacist
21  who operated Tech Pharmacy?
22     A. Sal Horowitz owned and operated it. Later
23  on his son Nason took over.
24     Q. Were Nason and Sal Horowitz friends of your

Page 37

1  father?
2      A. Yes.
3      Q. Do you recall ever seeing your dad's
4  signature, whether on a prescription slip or on
5  anything?
6      A. I've seen his signature.
7      Q. Would you describe his signature as being
8  distinctive in any way?
9      A. Yes, difficult to read.
10     Q. Okay.
11         MR. HENNINGER: That's not
12  distinctive for a doctor.
13         MR. ABODEELY: Lawyers are like
14  that, right.
15         MR. HENNINGER: Yeah.
16     Q. Do you have any reason to believe that your
17  father did not prescribe diethylstilbestrol even in
18  the earlier years of his practice to patients who had
19  indications for it?
20         MR. HENNINGER: Objection.
21     A. I don't know. I don't know.
22     Q. You mentioned something about the time
23  period after it became known that diethylstilbestrol
24  was associated with cancer in the daughters, the

Page 38

1  women who took it, did you get a number of calls from
2  Dr. Montag's patients about or to confirm that they
3  had been given diethylstilbestrol?
4      A. I remember he, he telling many people had
5  called.
6      Q. What would he tell them?
7      A. Whether or not he prescribed it to them.
8      Q. Okay. So would he pull the chart and
9  determine whether he had prescribed
10  diethylstilbestrol to that particular patient?
11     A. Yes. I mean, that would be how he would
12  know.
13     Q. Okay. Did his nurse handle those types of
14  calls also?
15     A. I'm not sure if she would hand the phone to
16  him. I guess he would probably refer them to the
17  nurse for the information, but I don't know.
18     Q. Okay. Were you in any way pressured or
19  threatened or cajoled or paid by me or anyone to
20  provide the information you did in the statements you
21  signed?
22     A. No.
23     Q. Do you stand by the information and the two
24  statements that you signed?

Page 39

1      A. Yes.
2          MS. STANFORD: Those are all the
3  questions I have and thank you very much, Mrs.
4  Greenberg.
5          The Witness: You're welcome.
6          MR. HENNINGER: I have just a few
7  follow-ups. Mr. Abodeely, you don't have any
8  questions, do you?
9          MR. ABODEELY: No.
10         REDIRECT EXAMINATION
11  BY MR. HENNINGER:
12     Q. Ms. Greenberg, you mentioned that prior to
13  1962 you were living in your father's home. You knew
14  that, you were aware that he had a practice and from
15  time to time you dropped by your father's office. At
16  any time prior to 1962 did your father discuss with
17  you his prescription practices with respect to
18  diethylstilbestrol?
19     A. No.
20     Q. Prior to 1962 did you know anything about
21  your father's prescription practices with respect to
22  diethylstilbestrol?
23     A. No.
24     Q. Okay. I believe Ms. Stanford's question was

Page 40

1  whether -- asked you a question whether or not you
2  knew your father, whether you believed that your
3  father's prescription practices were consistent
4  before 1962 and after 1962. Would it be true to say
5  that you just don't know whether or not he was
6  consistent before and after 1962?
7      A. No. I only know about the 1962.
8      Q. Okay. During the time that you worked with
9  your father in his office did you ever witness him
10  actually look at the product literature or the
11  warnings associated with the pharmaceutical drug
12  before prescribing it to a patient?
13     A. I never witnessed any of that.
14     Q. Then you don't know whether or not he
15  actually checked the warnings as a matter of -- let
16  me start that again.
17         Because you didn't actually witness him look
18  at the warnings you don't know whether or not he
19  checked them each and every time he prescribed a
20  drug, do you?
21         MS. STANFORD: Let me just object
22  to the form because it misstates her prior testimony
23  that he was an avid reader and he read product
24  literature, books and journals, et cetera.

Page 41

1          MR. HENNINGER: I'll ask the
2  question again. I don't think it essentially builds
3  on any of that.
4      Q. I'm asking specifically with respect to
5  product literature that contained warnings, do you
6  actually know whether or not your father consulted
7  those warnings before each and every time before he
8  prescribed a medication?
9          MS. STANFORD: Objection to the
10  form.
11     A. I know he studied the medications and read
12  all the information. I don't know when he read them.
13     Q. Okay. Ms. Stanford asked you whether or not
14  your father shared calls or got assistance from a few
15  other physicians. I'm just going to ask you a
16  question on each of them.
17         Do you know whether or not Dr. Fairbanks
18  ever covered for Dr. Montag in 1960 and '61
19  specifically?
20     A. No.
21     Q. Do you know whether Dr. Cheney ever covered
22  for Dr. Montag in 1960 or '61 specifically?
23     A. It wasn't Cheney, so.
24     Q. I'm sorry, Clancy. Let me ask the question

Page 42

1 again.
2     Do you know whether or not Dr. Clancy ever
3 covered for Dr. Montag specifically in 1960 or '61?
4     A. I don't know dates when they covered.
5     Q. I won't go through the rest of those
6 doctors.
7     You don't know the specific dates in which
8 they covered; is that correct?
9     A. Yes.
10    Q. Okay. You mentioned a Sal Horowitz and a
11 Nathan Horowitz. Could you just spell that last name
12 for us?
13    A. I think it's H-O-R-O-W-I-T-Z.
14    Q. Okay. And do you know if Sal or Nathan is
15 still alive today?
16    A. It's Nason, N-A-S. Nason is alive.
17    Q. He is alive?
18    A. Yes.
19    Q. Do you know where he lives?
20    A. 19 Cardinal Road.
21    Q. Okay. And that's in Worcester?
22    A. Yes.
23    Q. And you mentioned that their pharmacy was
24 called Tech Pharmacy. Can you just spell Tech?

Page 43

1     A. T-E-C-H.
2     Q. Okay. You testified before a little bit
3 about your father's practice with respect to when
4 women would call in and ask whether or not they were
5 prescribed diethylstilbestrol. Did it ever occur,
6 according to your knowledge of those conversations,
7 that a woman would ask if she had been prescribed
8 diethylstilbestrol and then told no, that she had not
9 been?
10    A. Not to my knowledge. I think people who
11 called were people who heard the information and
12 wanted to find out if they had taken it.
13    Q. And so each and every time you ever heard a
14 conversation about that they always said that they
15 had and your father had always confirmed that they
16 had been exposed?
17    A. I don't know what he confirmed.
18    Q. Okay. Another thing, it appears that we're
19 going to be able to find out contact information for
20 your friend Daphne, and given the relation that we
21 have here, do you know Daphne's contact information?
22    A. What does that mean? Do I know her contact?
23    Q. Could you give me her address?
24        MS. STANFORD: Let me object to the

Page 44

1 form of the question as irrelevant with discovery
2 cutoff is long gone and there's no right on behalf of
3 the defendant in this case to subpoena or contact
4 witnesses, or attempt to take further depositions.
5        MR. HENNINGER: And I will respond
6 to that on the record that this witness was disclosed
7 on the day of discovery to defendant and that's why
8 this deposition is taking place out of time. And
9 it's going to be a matter for the magistrate judge or
10 the judge to decide whether or not additional
11 discovery is required if indeed Ms. Abodeely has
12 information that's relevant to this case.
13       MS. STANFORD: Once again, I don't
14 want to waste their time by arguing, you know, that
15 Mrs. Montag's and Mrs. Greenberg's name and
16 information were provided to your firm months ago
17 during a previous deposition, so please don't put a
18 falsehood on the record that you just learned of her
19 the day before discovery.
20       Regardless of any of that, I made my
21 objection for the record and we'll take it up with
22 Judge Bouler if need be.
23       MR. HENNINGER: I agree with that.
24 I would only object to saying that there's a

Page 45

1 falsehood on the record now. There is no question
2 that we did not receive any statement from Ms.
3 Greenberg prior to the time that discovery closed and
4 that was all that I was saying by that, not that we
5 did not know of her. We did not know whether or not
6 her statement was going to be relevant to this case.
7 And I'll end it there.
8     Q. With that said, Mrs. Greenberg, the question
9 still stands. Do you know the address of Daphne
10 Abodeely?
11    A. Yes.
12    Q. Okay. Could you give that to me?
13        MR. ABODEELY: Can I answer that?
14        MR. HENNINGER: Sure.
15        MR. ABODEELY: It's my wife.
16        MR. HENNINGER: Yes.
17        MR. ABODEELY: 78-2 South
18 Quinsigamond Avenue.
19        MR. HENNINGER: Sorry, can you say
20 that again?
21        MR. ABODEELY: 78-2 South
22 Quinsigamond, Q-U-I-N-S-I-G-A-M-O-N-D, Avenue in
23 Shrewsbury.
24        MR. HENNINGER: Great. Okay,

### Page 46

1  that's all the questions I have.
2          MR. ABODEELY: All right.
3          MS. STANFORD: I would ask Mr.
4  Abodeely to ask Mrs. Greenberg to review the
5  transcript and sign it rather than waive that right.
6          MR. ABODEELY: Okay. Fine, shall
7  do.
8          MS. STANFORD: Thank you.
9          (Whereupon the deposition concluded
10 at 10:04 A.M.)

### Page 47

1       I, JOYCE MONTAG GREENBERG, do hereby certify
2  that I have read the foregoing transcript of my
3  testimony and it is a true and accurate record of
4  said testimony with the exception of the following
5  corrections:
6  PAGE  LINE           CORRECTION
7  ____  ____  _____
8  ____  ____  _____
9  ____  ____  _____
10 ____  ____  _____
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19
20       Signed under the pains and penalties of
21 perjury this _____ day of _____, 2005.
22
23       _____
24       Joyce Montag Greenberg

### Page 48

1          COMMONWEALTH OF MASSACHUSETTS
2  Middlesex, ss.
3
4       I, Jacqueline P. Shields, Registered
5  Professional Reporter and Notary Public in and for the
6  Commonwealth of Massachusetts, do hereby certify that
7  the person hereinbefore named, was by me duly sworn;
8  that they were thereupon examined upon their oath,
9  and their examination reduced to typewriting under my
10 direction and that the deposition is a true record of
11 the testimony given by the deponent.
12      I further certify that I am neither attorney
13 nor counsel for, nor related to or employed by, any
14 of the parties to the action in which this deposition
15 is taken, and further that I am not a relative or
16 employee of any attorney or counsel employed by the
17 parties hereto or financially interested in this
18 action.
19      In Witness Whereof, I have hereunto set my
20 hand and affixed my seal this 22nd day of September
21 2005.
22      _____
23      Notary Public
24      My Commission Expires: 4/6/2012



## AFFIDAVIT OF JOYCE MONTAG GREENBERG

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF WORCESTER

I, JOYCE MONTAG GREENBERG, being duly sworn, and under the pains and penalties of perjury, depose and say that the following information is true and correct and based upon my personal knowledge:

1. That my name is Joyce Montag Greenberg, and I currently reside in Worcester, Massachusetts.

2. That I am the daughter of Paul P. Montag, M.D., deceased, who was an OB/GYN physician who practiced medicine in the Worcester, Massachusetts area from the 1950s until his retirement in 1985.

3. That Dorothy White was a patient of my father's practice during her pregnancy in 1960-61. To my knowledge, the complete patient records from my father's practice no longer exist. However, I do have a book which lists thousands of infant deliveries he performed during his practice, and it includes the name of Dorothy White as a patient for whom he delivered a baby on April 13, 1961.

4. That it was my father's standard of practice during the 1960s to prescribe diethylstilbestrol to patients who had problematic pregnancies or a history of miscarriage. An acquaintance of mine was also a patient of my father's and was prescribed the same medication by him.

_____
JOYCE MONTAG GREENBERG

Witnessed by:

_____

Deliveries 1961

83  Barbara Crowley April 9 — Girl
84  Jeanne McKeon April 10 — Section Boy
85  Joan Leone April 11 — Boy
86  Ann Bottcher April 11 Boy
87  Janice Tateson April 11 — Boy
88  Grace Masiello April 11 Boy —
89  Mary McGill April 12 — Girl
90  Jocelyn Salpet April 13 — Girl
91  Dorothy White April 14 — Girl *
92  Joan Harrington April 13 — Boy
93  Jean Joyes April 17 — Girl
94  Ethel Sjoblom April 18 —
95  Madge Reynolds April 18  19 Cesarian
96  Irene Merrill April 19 —
97  Natalie Bird April 22 —
98  Ellen Jette April 24 — Female
99  Harriett LeBlanc April 25 — injured Girl
100 Marion King April 26 — Girl
101 Priscilla Donachie April 28 —
102 Gail Torte April 28 —
103 Sally Perrier April 30 — Boy
104 Shirley McEvoy May 1 — Premature del
105 Pauline Moren May 1
106 Denise Etterstrom May 5 — Boy
107 Barbara Shea May 9 Induced — Boy
108 Joan Kelly May 9 — Not delivered
109 Beverly Caton May 11 — Boy
110 Sandra O'Driscoll Induced May 12
110 Claire Hammond May
111 Barbara Sutcliff induced May 18 — del



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
BOSTON DIVISION

BARRY DAVIS, individually, and as Administrator
of the ESTATE OF LINDA MARIE DAVIS, deceased,

          *Plaintiff*,

vs.                                            Civil Action No.: 1:04-cv-10349-MEL

ELI LILLY AND COMPANY,
an Indiana corporation,

          *Defendant*.

---

### SUPPLEMENTAL AFFIDAVIT OF JOYCE MONTAG GREENBERG

COMMONWEALTH OF MASSACHUSETTS
COUNTY OF WORCESTER

    I, JOYCE MONTAG GREENBERG, being duly sworn, and under the pains and penalties of perjury, depose and say that the following information is true and correct and based upon my personal knowledge:

    1.    That my name is Joyce Montag Greenberg, and I currently reside in Worcester, Massachusetts.

    2.    That I am the daughter of Paul P. Montag, M.D., deceased, who was an OB/GYN physician who practiced medicine in the Worcester, Massachusetts area from the 1950s until his retirement in 1985.

    3.    That this statement is given to supplement the one I previously gave in this matter.

    4.    That I did work from time to time in my father's medical practice which was located on the first floor of the house in which we lived. I did things such as greet and escort patients to examining rooms, take and record blood pressure readings, and follow any other instructions given to me by my father or his nurse. He did have one nurse who handled most of the office work with patients; my mother also worked in the office handling mostly administrative matters.

    5.    As I stated in my previous affidavit, it was my father's standard and custom of practice during the 1950s and 1960s to prescribe diethylstilbestrol to patients who had problematic

Statement of Joyce Montag Greenberg
Page Two

pregnancies or a history of miscarriage. I recall that during the years after it became known that diethylstilbestrol use might cause cancer in the daughters of women who took it, my father received many calls from concerned patients about diethylstilbestrol. It is the combined memories of my work in his office and these later events that form the basis of my knowledge that my father prescribed diethylstilbestrol as opposed to some other form of anti-miscarriage medication.

6.   My father was an extremely well-respected and well-liked physician and member of the community. He regularly received visits and literature from drug company representatives, and I am quite sure that he kept abreast of current information regarding treatments and medicines that he used in his practice. Knowing the standards and principles he followed in his practice and in his life, I am quite sure that he would not have prescribed any medication to a pregnant patient if he knew it posed serious potential risks to her child.

Executed this 25 day of August, 2005

_____
JOYCE MONTAG GREENBERG